# UNITED STATES DISTRICT COURT

## District of Kansas

### (Kansas City Docket)

CLINT A. LORANCE,

        Petitioner,

  v.

DAWN HILTON,
Colonel, United States Army,
Commandant, United States
Disciplinary Barracks,
Ft. Leavenworth, Kansas,

        Respondent.

CASE NO. <u>18-cv-3297-JWL</u>

---

## RESPONDENT'S ANSWER AND RETURN

---

APPEARS NOW Jared S. Maag, Assistant United States Attorney, on behalf of the Respondent in the above-entitled action, and respectfully submits the following Answer and Return to the Show Cause Order issued by this Court on December 19, 2018. (Doc. 3, Order at 1.)

Respondent admits that petitioner is a former active duty member of the United States Army and is presently an inmate at the United States Disciplinary Barracks ("USDB") at Fort Leavenworth, Kansas, within the District of Kansas.

Respondent denies each and every material allegation contained in the petition, (Doc. 1, Pet. for Writ at 1-80), except as hereinafter may be expressly admitted, and further denies that petitioner is entitled to any relief from this Court.

In support of the factual allegations contained herein, Respondent incorporates the following Attachments:

Attach. A:  Army Court of Criminal Appeals decision dated 27 June 2017

Attach. B:  Court of Appeals for the Armed Forces Order Denying Petition dated 19 December 2017

Attach. C:  Record of Trial, Vol. IX, p. 919

Attach. D:  Record of Trial, Vol. XI, Appellate Exhibit XXXVIII

Attach. E:  General Court-Martial Order No. 29 dated 31 December 2014

Attach. F:  Petition for Grant of Review to the Court of Appeals for the Armed Forces dated 28 August 2017

Attach. G:  Supplement to Petition for Grant of Review to the Court of Appeals for the Armed Forces

Attach. H:  Brief on Behalf of Appellant to the Army Court of Criminal Appeals

Attach. I:  Record of Trial, Vol. VIII, pp. 791-808

Attach. J:  Record of Trial, Vol. VIII, pp. 829-30, 832

Attach. K:  Record of Trial, Vol. VIII, pp. 840-44

Attach. L:   Record of Trial, Vol. IX, p. 941

Attach. M:   Record of Trial, Vol. VIII, pp. 782, 784

Attach. N:   Record of Trial, Vol. V, pp. 244-46, 256-66, 298

Attach. O:   Record of Trial, Vol. V, p. 302; Vol. VI, pp. 362, 448;
Vol. VII, pp. 526-27, 628, 640

Attach. P:   Record of Trial, Vol. V, pp. 333-34

Attach. Q:   Record of Trial, Vol. VI, pp. 370, 372-73, 498; Vol. VII,
pp. 549, 552-54, 630-31, 709

Attach. R:   Record of Trial, Vol. VI, p. 469

## I.   PROCEDURAL HISTORY

Petitioner was tried by general court-martial [1] at Fort Bragg, North

Carolina from 30 July 2013 through 1 August 2013, and convicted of attempted

murder, murder, wrongfully communicating a threat, reckless endangerment,

soliciting a false statement, and obstructing justice in violation of Articles 80,

---

[1] Unlike courts of standing jurisdiction, courts-martial are convened by military officers who have been granted that authority under the Uniform Code of Military Justice ("UCMJ") [1998 ed.], Article 18, 10 U.S.C. § 818 (now Article 22, 10 U.S.C. § 822). Under the UCMJ, Rule for Courts-Martial ("R.C.M.") 1107, once a military judge or court members have adjudged a sentence, the convening authority takes action on the sentence and may disapprove a legal sentence or change the nature of the punishment as long as the severity of the punishment is not increased. Prior to taking action, the convening authority must consider the result of trial, the recommendation of the staff judge advocate, and any matters submitted by the accused, including requests for clemency and matters in mitigation. The convening authority may consider the record of trial, the personnel records of the accused and other appropriate matters. If other matters considered are adverse to the accused, the accused has a right to be notified and have an opportunity to rebut.

118, and 134 Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 918, 934 (2012). *United States v. Lorance*, No. 20130679, 2017 WL 2819756 (Army Ct. Crim. App. 27 June 2017) (unpub.) (Attach. A); *rev. denied*, 77 M.J. 136 (C.A.A.F. 2017) (Attach. B); *see also* Record of Trial, Vol. IX, at 919 (Attach. C.)[2] Petitioner was sentenced to a dismissal, confinement for twenty (20) years, and forfeiture of all pay and allowances. *Lorance*, 2017 WL 2819756, at *1 (Attach. A); Record of Trial, Vol. XI, Appellate Exhibit XXXVIII (Attach. D.) The convening authority downgraded petitioner's sentence to nineteen (19) years confinement but approved the remainder of the sentence. *Lorance*, 2017 WL 2819756, at *1 (Attach. A); Record of Trial, Vol. I, General Court-Martial Order No. 29 dated 31 December 2014 (Attach. E.)

On June 27, 2017, the United States Army Court of Criminal Appeals affirmed petitioner's convictions and sentence. *Lorance*, 2017 WL 2819756, at *1-7[3] (Attach. A.)

---

[2] The Record of Trial consists of 11 volumes and 2,258 pages of material. Respondent cites only to relevant portions of the Record of Trial by volume number (i.e. Vol. I) and corresponding page number on the original document in the case of the trial transcript. Respondent submits those portions as attachments to this Answer. A certified copy of the record of trial is maintained by the United States Army and can be produced to the Court for additional review in its entirety if necessary.

[3] On appeal before the Court of Criminal Appeals, the panel reviewed all six errors of assignment set forth in petitioner's brief; however, it was determined that only two of the alleged errors—discovery violations and ineffective assistance of counsel—warranted discussion. The remaining errors were considered in accordance with *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and rejected on grounds that each of the allegations was meritless.

On August 28, 2017, petitioner filed a Petition for a Grant of Review with the United States Court of Appeals for the Armed Forces (CAAF) (Attach. F); and, in accordance with Rule 20(e) of the Rules of Practice and Procedure for CAAF, counsel for petitioner filed a Supplement to the Petition for Grant of Review on or about October 10, 2017 (Attach G.)

On December 19, 2017, the United States Court of Appeals for the Armed Forces denied petitioner's petition for review. *United States v. Lorance*, 77 M.J. 136 (C.A.A.F. 2017) (No. 17-0599/AR – CCA 20130679) (Attach. B).)[4]

Exactly one year later, on December 18, 2018, petitioner filed the instant appeal pursuant to 28 U.S.C. § 2241 in the United States District Court for the District of Kansas. (Doc. 1, Pet. for Writ at 1-80.) On appeal, petitioner raises the following five (5) grounds:

(1) "[Petitioner] was deprived of his Fifth Amendment due process rights because the prosecution failed to disclose material exculpatory and mitigating evidence, including fingerprint and DNA evidence that Afghan men were not

---

*Lorance*, 2017 WL 2819756, at *1 (Attach. A.)

[4] Petitioner did not have authority to seek review with the Supreme Court of the United States given that his petition for review was denied by the Court of Appeals for the Armed Forces. *See* 10 U.S.C. § 867a(a) ("(a) Decisions of the United States Court of Appeals for the Armed Forces are subject to review by the Supreme Court by writ of certiorari as provided in section 1259 of title 28. The Supreme Court <u>may not review</u> by a writ of certiorari under this section any action of the United States Court of Appeals for the Armed Forces in refusing to grant a petition for review.") (emphasis supplied).

civilian casualties as the prosecution told the panel, but in fact terrorist bomb makers who intended to kill American Soldiers." (Doc. 1, Pet. for Writ at 3.)

(2) "The prosecution's misconduct, taken as a whole from pretrial to post-trial, not only led to unlawful convictions and the sentence, but also deprivations of meaningful appellate review and statutorily-required review by the Secretary of the Army." (*Id*. at 4-5.)

(3) The military courts found defense counsel's performance reasonable even though [petitioner's] retained civilian attorney: did not interview any American or Afghan witness, to include the Afghan attempted murder victim and an two Afghan material eyewitnesses; arrived the night before this fully contested double murder and attempted murder panel trial where [petitioner] faced a potential life sentence from another trial in a different state; did not reveal to the panel that witnesses were given immunity and ordered to cooperate in the case against [petitioner]; did not interview the previous Platoon Leader who wrote that he would never allow a motorcycle to get near his Platoon; and failed to secure from the prosecution fingerprint and DNA evidence that the purported victims were not civilian casualties as the prosecution claimed, but terrorist bomb makers. The appellate decision in *Lorance* does not address, head on, counsel's insufficient pretrial investigation which actually and materially prejudiced [petitioner's] substantial trial rights." (*Id*. at 5-6.)

(4) "The Army Court declined to discuss [petitioner's] claim that Due Process went unobserved again when the trial judge failed to instruct the panel on affirmative defenses that were raised and supported by the evidence presented at trial, such as justification, obedience to orders, mistake of fact, or duress." (*Id.* at 6.)

(5) "The Army Court did not address the seemingly pivotal question [petitioner] presented, a point that reasonably stood to require a new trial or a complete reversal: whether an order to fire based on ROE[5]-compliance at targets that were insurgent bomb makers can be murder or attempted murder in a combat zone. Neither did the Army Court consider that even if the Afghan victims were truly innocent civilians, that they were casualties of war under applicable international law categorized as "collateral damage," decisions which occur regularly when drone strikes kill innocent civilians. Nor did the Army Court evaluate the sufficiency of the remaining evidence after recognizing that [petitioner] was acquitted of changing the ROE, an analysis the Army Court never embraced." (*Id.* at 6.)

II.   <u>FACTUAL HISTORY</u>

In support of the factual allegations contained herein, Respondent incorporates the following statement of facts as set forth in the case of *United*

---

[5] Rules of Engagement.

*States v. Lorance*, No. 20130679, 2017 WL 2819756 (Army Ct. Crim. App. 27

June 2017) (unpub.):

In 2012, [petitioner] and members of 4th Brigade Combat Team (BCT), 82nd Airborne Division were deployed to Afghanistan. During this time, the Chairman of the Joint Chiefs of Staff's Standing Rules of Engagement (SROE) were in effect. The SROE permitted soldiers to use force in defense of themselves or others upon the commission of a hostile act or the demonstration of imminent hostile intent. There were no declared hostile forces, and thus no authority to engage any person upon sight.

In June 2012, First Platoon of the BCT was situated at an outpost named Strong Point Payenzai, located near the village of Sarenzai in the Zharay district of Kandahar province. First Platoon had recently lost their platoon leader to injury from an improvised explosive device (IED), and had suffered other casualties in the months prior. [petitioner], who had spent the deployment as the squadron liaison officer (LNO) at the brigade tactical operations center (TOC), was assigned to take over as the platoon leader.

On 30 June 2012, [petitioner], in his new role, was leading the platoon back to Strong Point Payenzai from the Troop TOC at Strong Point Ghariban. As they approached the Entry Control Point (ECP), [petitioner] encountered an Afghan villager with a young child. The villager was asking to move some concertina wire on the road leading to Strong Point Payenzai that was impeding his ability to work on his farm. [Petitioner] told the villager that if he touched the concertina wire, he and his family would be killed. [Petitioner] conveyed the seriousness of his message by pulling back the charging handle of his weapon and pointing the weapon at the young child. [Petitioner] ended the encounter by instructing the villager to come to his shura, a meeting, and to bring twenty people.

The next day, [petitioner] ordered two of his soldiers to go up into one of the towers and shoot harassing fire in the general direction of villagers. [Petitioner] told the soldiers he was doing this in order to provoke the villagers' attendance at the upcoming shura. Hearing the shots, the Troop TOC radioed Strong Point Payenzai for a

report. [Petitioner] instructed a noncommissioned officer to respond by falsely reporting the Strong Point was receiving fire.

On 2 July 2012, a mission brief was held for the platoon and their accompanying Afghanistan National Army (ANA) element before they left to go on a patrol. In this briefing, it was announced that motorcycles were now authorized to be engaged on sight, although the testimony was somewhat inconsistent with at least one soldier recalling this coming from the ANA while others identified [petitioner] as the source of this new information. [Petitioner] had posted a sign in the platoon headquarters prior to the patrol stating that no motorcycles would be permitted in the area of operations. As the platoon, with the ANA element in the lead, moved out they encountered a number of villagers near the ECP complaining about the shots from the day prior. [Petitioner] told the villagers that they could discuss it at the upcoming shura. [Petitioner] told the villagers to leave and then began counting down from five. The platoon began its patrol.

Not long into the patrol, Private First Class (PFC) Skelton, the Company Intelligence Support Team (COIST) member attached to the platoon headquarters element, called out to [petitioner] that he observed a motorcycle with three passengers. PFC Skelton did not report any hostile actions, but simply that he spotted a motorcycle with three passengers in his field of view. [Petitioner] did not ask whether the motorcycle passengers were presenting any threat. [Petitioner] ordered PFC Skelton to engage the motorcycle. PFC Skelton complied and fired his weapon, but missed. At trial, PFC Skelton testified that he would not have fired upon the motorcycle or its passengers on his own, because "there was no reason to shoot at that moment in time that presented a clear, definitive hostile intent and hostile act."

Apparently in response to the impact of PFC Skelton's rounds, the motorcycle stopped, the male passengers dismounted and began walking in the direction of the ANA unit. The ANA soldiers did not open fire, but rather gesticulated to the men, who then headed back to their motorcycle. As the three men returned to the motorcycle, [petitioner], over his portable radio, ordered the platoon's gun truck to engage the men. Private E–2 (PV2) Shiloh, the gunner on the 240

machine gun in the gun truck that had overwatch of the patrol, had continuous observation of the victims from after the first set of shots by PFC Skelton. Upon receiving [petitioner]'s order, Private Shiloh fired his weapon, killing two of the riders and wounding the third. The third victim ran away into the village. Prior to the engagement, the victims had no observable weapons or radios, and were not displaying any hostility toward U.S. or Afghan forces. According to PV2 Shiloh, the only reason he engaged the men was because he was ordered to do so by [petitioner]. Following the engagement, the two deceased victims were on the ground, and the motorcycle was standing up, kickstand still down. Upon learning that the motorcycle was still standing, [petitioner] ordered PV2 Shiloh to engage and disable the motorcycle. PV2 Shiloh refused this order, noting that a young boy was nearby.

Shortly after this engagement, helicopter support came on station. The aircraft crew received a request to locate the third motorcycle rider last seen running into the village. While on station, the pilot took aerial photographs of the two deceased victims and the motorcycle. Sergeant First Class (SFC) Ayres, the platoon sergeant, linked up with [petitioner] to find out what happened, as he had heard the shots moments before. [Petitioner] told SFC Ayres that the aircraft had spotted the men on the motorcycle with weapons before his troops engaged.

[Petitioner] ordered two soldiers, PFC Wingo and PFC Leon, to conduct a Battle Damage Assessment (BDA) of the deceased victims. BDAs normally entailed taking photographs, obtaining biometric data, and testing for any explosive residue on the bodies. Private First Class Skelton was the soldier trained and equipped to conduct a BDA and was also responsible for briefing the TOC afterwards. Even though PFC Skelton was standing right next to [petitioner], [petitioner] had PFC Wingo and PFC Leon conduct the BDA, neither of whom had the training or equipment to properly perform the task. When PFC Skelton reminded [petitioner] that he was supposed to do the BDA, [petitioner] told PFC Skelton not to because he wouldn't like what he saw.

After the two soldiers conducted a cursory inspection of the victims, [petitioner] told the gathered villagers to take the bodies. The

soldiers did not find any weapons, explosives or communications gear on the bodies. [Petitioner] then told the radio transmission operator (RTO) to report over the radio that a BDA could not be done because the bodies were removed before the platoon could get to them. When the RTO did not make this report, [petitioner] took over the radio and made this report to Captain (CPT) Swanson, the Troop Commander.

After the mission, and back at Strong Point Payenzai, [petitioner] told PFC Skelton not to include the BDA information in his upcoming brief to the TOC. Private First Class Skelton went to the TOC at Strong Point Ghariban to deliver his intelligence brief on the patrol. Upon arriving, he informed the COIST platoon leader that he needed to speak with CPT Swanson. PFC Skelton told CPT Swanson what happened on the patrol and that he believed they may have civilian casualties. Shortly thereafter, [petitioner] was relieved of his duties pending an investigation into the events.

*Id*. at *1-3 (Attach. A.)

III.    STANDARD OF REVIEW

This Court's narrow review standard is well-established. *Burns v. Wilson*, 346 U.S. 137, 144 (1953) ("It is the limited function of the civil courts to determine whether the military have given fair consideration to ["petitioner's] claims.");[6] *Lips v. Commandant, U.S. Disciplinary Barracks*, 997 F.2d 808, 811

---

[6] Respondent submits that this Court must apply a greater standard of deference than that which is applied to state habeas corpus cases reviewed under 28 U.S.C. § 2254. There is certainly support for this assertion. *See Burns*, 346 U.S. at 142 ("The military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights. In military habeas corpus cases, **even more than in state habeas corpus cases**, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted.") (emphasis supplied); *Davis v. Marsh*, 876 F.2d 1446, 1449 (9th Cir. 1989) (noting Supreme Court's repeated admonitions that courts accord even more deference to military court determinations than those of state

(10th Cir. 1993) ("Under *Burns*, if the military gave full and fair consideration to claims asserted in a federal habeas corpus petition, the petition should be denied. Only when the military has not given a petitioner's claims full and fair consideration does the scope of review by the federal civil court expand."); *Khan v. Hart*, 943 F.2d 1261, 1262 (10th Cir. 1991) ("Our jurisdiction to review a military conviction for constitutional error is limited because habeas jurisdiction of a federal civil court does not extend to a reassessment of the facts and issues fully and fairly considered by a military court."). Likewise, this Court sits "only [to] review habeas corpus petitions from the military courts that raise substantial constitutional issues," *Roberts v. Callahan*, 321 F.3d 994, 997 (10th Cir. 2003); and, this Court must decline review on any ground that was not properly exhausted before the military courts. *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir. 1986) ("We will not review petitioners' claims on the merits if they were not raised at all in the military courts . . ."); *Schlesinger v. Councilman*, 420 U.S. 738, 758 (1975) ("federal courts normally will not entertain habeas petitions by military prisoners unless all available military remedies have been exhausted."); *Noyd v. Bond*, 395 U.S. 683, 693-94 (1969) ("habeas corpus petitions from

---

courts); *cf. Brosius v. Warden, U.S. Penitentiary, Lewisburg, PA*, 278 F.3d 239, 245 (3d Cir. 2002) ("Whatever *Burns* means, we have no doubt that at least absent a challenge to the constitutionality of the statute under which the defendant was convicted, such as that raised in *Levy*, our inquiry in a military habeas case may not go further than our inquiry in a state habeas case.").

military prisoners should not be entertained by federal civilian courts until all available remedies within the military court system have been invoked in vain."); *Nixon v. Ledwith*, 635 Fed. App'x 560, 565 (10th Cir. 2016) (unpub.) ("Like a state prisoner, a military prisoner must fully exhaust his claims in the military courts before raising a claim on federal habeas review."); *Davis v. Lansing*, 202 F.Supp.2d 1245, 1249 (D. Kan. 2002), *aff'd*, 65 Fed. App'x. 197 (10th Cir. 2003) (noting that a plurality of the Supreme Court has stated that a district court may not review challenges to military courts-martial *de novo* unless the military courts have manifestly refused to consider the claims).

In deciding whether to review a military habeas petition, a four-factor test is generally employed. *See Dodson v. Zelez*, 917 F.2d 1250, 1252-53 n.1 (10th Cir. 1990). Accordingly, review by this Court is appropriate only if the following four conditions are met: "(1) the asserted error is of substantial constitutional dimension; (2) the issue is one of law rather than of disputed fact already determined by the military tribunal; (3) there are no military considerations that warrant different treatment of constitutional claims; and (4) the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards." *Lips*, 997 F.2d at 811; *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670-71 (10th Cir. 2010) (Noting that fourth factor is deemed the most important consideration).

Finally, on the point of adequate consideration, Respondent stresses that "[t]he Tenth Circuit has consistently held full and fair consideration does not require a detailed opinion by the military court." *Thomas*, 625 F.3d at 671; *Watson*, 782 F.2d at 145 ("[w]hen an issue is briefed and argued before a military board of review, we have held that the military tribunal has given the claim fair consideration, even though its opinion summarily disposed of the issue with the mere statement that it did not consider the issue meritorious or requiring discussion."); *Brimeyer v. Nelson*, 712 Fed. App'x 732, 736 (10th Cir. 2017) (unpub.). Notably, military appellate courts routinely invoke the process outlined in *United States v. Grostefon*, supra at n. 3, which requires that a military court, at bottom, "acknowledge that it has considered those issues enumerated by the accused and its disposition of them." 12 M.J. at 436. Such was the case here involving grounds four (insufficient instructions), and five (insufficient evidence) raised by petitioner in the instant pleading. *Lorance*, 2017 WL 2819756, at *1 (Attach. A) ("We review this case under Article 66, UCMJ. [Petitioner] assigns six errors, only two of which—alleging discovery violations and ineffective assistance of counsel—merit discussion, but no relief. We have considered matters personally asserted by [petitioner] under [*Grostefon*] and find that they lack merit.)

14

IV.   <u>UNEXHAUSTED   CLAIM</u>   (Ground   Two   –   Prosecutorial
      Misconduct)

Petitioner submits five claims for this Court's consideration. (Doc. 1, Pet.

for Writ at 1-80.) Claim two, however, should be rejected because petitioner

failed to properly exhaust this specific allegation of prosecutorial misconduct.

Indeed, a comprehensive review of the pleadings before the military appellate

courts demonstrates that petitioner was deficient in pleading this claim. There is

nothing in the record to demonstrate that petitioner ever raised an unmistakable

claim of prosecutorial misconduct, such as he does now before this Court. *See,*

*e.g.* Attach. G (Pet. Supp. Brief (CAAF) and Attach. H (Pet. Brief (USACCA).

In his brief before this Court, petitioner maintains that trial counsel for the

United States Army engaged in misconduct; and, that "taken as a whole from

pretrial to post-trial, [such misconduct] not only led to unlawful convictions and

the sentence, but also deprivations of meaningful appellate review and

statutorily required review by the Secretary of the Army." (Doc. 1, Pet. for Writ

at 4-5.) Petitioner then sets out various (and quite specific) examples to

demonstrate trial counsel's alleged misconduct. (*Id.*) Later in his brief, petitioner

goes to greater lengths to describe trial counsel's alleged misconduct. (*Id.* at 63-

68.)

Prosecutorial misconduct is a very specific charge; and, for petitioner to

succeed on a claim of alleged misconduct, various requirements must have been

satisfied below, namely, specific objections at trial which bring to the surface such allegations and a recognizable level of appellate consideration that seeks to balance petitioner's right to a fair trial against the cumulative impact of any alleged misconduct. *See, e.g., United States v. Hornback*, 73 M.J. 155, 159-60 (C.A.A.F. 2014). None of these requirements were met throughout the course of petitioner's trial and appeal below, largely because petitioner never submitted a discrete claim of prosecutorial misconduct to the military courts for consideration outside the umbrella argument that the government ran afoul of its requirements under *Brady* and R.C.M. 701(a)(6).

Again, it is well-settled that petitioner must fully exhaust a stand-alone claim of prosecutorial misconduct in front of the military courts before raising this very specific allegation on federal habeas review. *Nixon*, 635 Fed. App'x at 565. He failed to meet the exhaustion requirement in this circumstance. *Roberts*, 321 F.3d at 995 (". . . if a ground for relief was not raised in the military courts, then the district court must deem that ground waived."). Likewise, petitioner can only obtain relief if he can establish cause for his failure to raise the distinct claim of prosecutorial misconduct and resulting prejudice if the claim is not considered. *Lips*, 997 F.2d at 812. Petitioner can satisfy neither requirement here.

Because petitioner has clearly failed to exhaust his alleged (and individualized) claim of prosecutorial misconduct, this Court must reject his argument on grounds that it has been waived.

## V.   GROUND ONE WAS FULLY AND FAIRLY REVIEWED

Petitioner devotes a majority of his pleading to persuade this Court that his Fifth Amendment due process rights were violated as a result of the government's failure to disclose material, exculpatory, and mitigating evidence, namely, information suggesting that the Afghan victims were in fact targetable belligerents who intended to kill American service members. (Doc. 1, Pet. for Writ at 3-4, 50-63.) This claim was fully and fairly considered by the military courts and rejected. Accordingly, under this Court's review standard, petitioner's appeal on this issue must be denied.[7]

Petitioner maintains the government withheld exculpatory evidence that would have provided significant assistance to his defense. More specifically, petitioner argues the United States Army possessed information demonstrating (through biometric data) that the four Afghan men engaged by the platoon were in fact "terrorist bomb makers and enemy combatants." (*Id*. at 28.) And, had this information been disclosed, petitioner maintains he would have been able

---

[7] On appeal before the Court of Criminal Appeals, petitioner submitted this argument as the first assignment of error in his brief, and the first assignment of error in his petition before the Court of Appeals for the Armed Forces. (Attach. H, at 17-18; Attach G, at 17-25).

to argue to the panel that the men killed and wounded may have been terrorist bomb makers rather than civilians, as suggested by the government during trial. (*Id.* at 29.)

The United States Army Court of Criminal Appeals fully and fairly considered the entirety of petitioner's claim, finding it less than meritorious. *Lorance*, 2017 WL 2819756, at *3-5 (Attach. A.) The Court below held that the biometric data was not favorable to petitioner because (1) the data was relevant _**only**_ if petitioner would have been aware of its significance _**before**_ he ordered his men to fire on the unarmed Afghans, (2) the Afghan men posed no discernible threat to the platoon; thus, countering any argument that it was necessary under the SROE to engage these unarmed men in the first place, and (3) petitioner could not establish any "scenario for the admissibility of such evidence during the trial" because the information was irrelevant as to what petitioner knew at the time he ordered the shootings. *Id.* at *4-5.

The Court of Criminal Appeals appreciated what petitioner was attempting to argue, namely, that had the government disclosed the biometric data prior to trial he would have wanted to nullify the panel by arguing that while he may have ordered the shooting of unarmed Afghan civilians, he was nevertheless innocent of this obvious war crime because the deceased men were terrorists; and, despite the inescapable fact that neither he nor any member of

his platoon possessed this information prior to shooting, this lack of knowledge should not be a concern, because, at the end of the day, "they were bad guys anyway." Or, in other words,

> "*these Afghans were terrorists anyway, so shooting them was warranted, despite the fact that my actions violated the basic tenants of the laws of armed conflict, the SROE, and the ROE.*"

Petitioner attempts to layer his argument before this Court in an effort to raise the alleged *Brady* violation to a level of significant constitutional concern. His arguments, however, cannot overcome the one, ineluctable fact that drives this entire issue—he did not have ***any*** knowledge that the Afghan men were in fact terrorists. To that end, this Court should not view the matter through the distorted lens that petitioner seeks to use. Simply put, the biometric data was not admissible, not relevant, or material, such that it ran afoul of *Brady* or R.C.M. 701(a)(6).

More importantly, however, the Court of Criminal Appeals gave full and fair consideration to petitioner's claim; and, under the strict review standard, not one, much less all four, of the required conditions have been met. Again, review by this Court is appropriate only if the following four conditions are met: "(1) the asserted error is of substantial constitutional dimension; (2) the issue is one of law rather than of disputed fact already determined by the military tribunal; (3) there are no military considerations that warrant different treatment of

constitutional claims; and (4) the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards." *Lips*, 997 F.2d at 811. Petitioner fails to persuade a different result when all four factors are considered.

For the foregoing reasons, petitioner's argument on ground one must be rejected and all relief denied.

## VI.   GROUND THREE WAS FULLY AND FAIRLY REVIEWED

Petitioner's argument that the military courts failed to give adequate consideration to his claim that defense counsel was ineffective must also be rejected given that the Army Court of Criminal Appeals gave full and fair consideration to petitioner's claim.[8]

As below, petitioner maintains that retained defense counsel was ineffective for a host of reasons. Before the Court of Criminal Appeals, petitioner argued that defense counsel was ineffective because (1) counsel failed to maintain adequate communication with him; (2) counsel failed to interview critical witnesses; (3) counsel was generally unprepared for trial; (4) for myriad reasons, counsel's presentation at trial was unreasonable; and (5) "lead defense counsel's performance was deficient because he failed to present, 'all factors and

---

[8] On appeal before the Court of Criminal Appeals, petitioner submitted this argument as the fourth assignment of error in his brief, and the third assignment of error in his petition before the Court of Appeals for the Armed Forces. (Attach. H, at 33-50; Attach G, at 30-40.)

circumstances necessary to ensure the proper functioning of the adversarial process.'" (Attach. H, at 33-50.) Before CAAF, petitioner argued that defense counsel failed to (1) interview witnesses; (2) interview members of the platoon; (3) adequately obtain discovery; and (4) develop a legal defense. (Attach. G, at 30-40.)

On appeal here, petitioner resurrects the same concerns raised before the military courts; yet, unlike below, he lists sixteen (16) specific grounds of ineffectiveness on defense counsel's part in the present pleading. (Doc. 1, Pet. for Writ at 5-6, 68-71.)

The Court of Criminal Appeals employed the proper standard under *Strickland v. Washington*, 466 U.S. 668 (1984), and noted that petitioner focused his attention only on hired defense counsel rather than on the combined efforts of hired counsel *and* military assigned counsel. *Lorance*, 2017 WL 2819756, at *6 (Attach. A.) In the Court's opinion this was significant because "the performance of defense counsel is measured by the combined efforts of the defense team as a whole." *Id.* (quoting *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001).) To that end, the Court considered every one of petitioner's claims of ineffective assistance balanced against the record; the experience and abilities of defense counsel; the pretrial proceedings; the investigative efforts of the defense team; the selection of the court members; the

trial strategy; the performance of counsel during the trial; the sentencing case;

and the post-trial proceedings. *Id.* (citing *United States v. Murphy*, 50 M.J. 4, 8

(C.A.A.F. 1998).)

In applying the *Strickland* standard, and concentrating on the focused areas

described above, the Court of Criminal Appeals held as follows:

> The record reflects that [petitioner] was fully advised of his rights, the evidence against him, and that he substantively communicated with his defense team regularly. He was routinely consulted for his opinion on trial strategy, and was intimately involved with the decision making of his defense team. The trial strategy adopted by the defense, with the endorsement of [petitioner], was that these were combat related shootings and not orders to murder. To that end, the defense team competently pursued this theory at every stage of the proceedings. The defense team worked to portray [petitioner] as a "by the book" officer trying to bring discipline back to a unit that had gotten lax under its prior platoon leader. They also attempted to explain his actions as those of an aggressive young officer trying to protect his men from further harm. The defense questioned numerous government witnesses to expound on the frequent use of motorcycles by hostile elements in this area of operations. Given the overwhelming evidence against [petitioner], it is difficult to conceive of any other viable defense.

> Even had the defense team located biometric evidence pertaining to the victims, and it was somehow introduced into evidence, there is no reasonable probability that the result of the proceeding would have been different. On the contrary, had this evidence been presented at trial, it is likely the panel members would have considered it an aggravating factor. The fact that the surviving victim was linked to hostile action against U.S. forces only after his compatriots were killed illustrates that [petitioner's] actions directly resulted in a significant adverse impact on the mission of the command. This is also supported by detailed defense counsel's affidavit when he discussed his rationale for being unable to make a site visit. That is, after the village elder was killed in this incident,

the area became so kinetic that U.S. forces withdrew from there altogether.

*Lorance*, 2017 WL 2819756, at *6-7 (Attach. A.)

The Army Court of Criminal Appeals gave significant attention to petitioner's complaints that hired defense counsel was allegedly ineffective. Understandably, the Court appreciated the narrow focus of petitioner's defense and the manner in which counsel chose to pursue that line of argument. However, more importantly, the Court appreciated that petitioner was represented by both hired counsel and military counsel and that it was necessary to consider the petitioner's claims with that in mind. Simply put, the Court of Criminal Appeals unquestionably gave petitioner's claims a full and fair review. And, petitioner's allegation does not (in the end) raise a substantial constitutional issue that would warrant this Court reversing the decision of the military appellate court and its qualified consideration of the matter.

For the foregoing reasons, this Court should reject petitioner's claims on this ground as it fails to satisfy the four conditions necessary for relief to be granted. *See Dodson,* 917 F.2d at 1252-53 n.1.

VII. <u>GROUNDS FOUR AND FIVE WERE FULLY AND FAIRLY CONSIDERED</u>

In grounds four and five, petitioner submits that the trial judge erred in failing to issue instructions to the panel on affirmative defenses; and, that there

was insufficient evidence to support his convictions for murder and attempted murder, respectively. (Doc. 1, Pet. for Writ at 6, 72-76.)

The Army Court of Criminal Appeals determined that these two issues did not merit discussion and summarily rejected both claims. *Lorance*, 2017 WL 2819756, at *1 (Attach. A.)

A.   FAILURE TO GIVE INSTRUCTIONS

In his brief before the Court of Criminal Appeals, petitioner argued that the trial judge erred when she failed to *sua sponte* provide the panel instructions on justification, obedience to orders, coercion or duress, and ignorance or mistake of fact. (Attach. H, at 26-33.) In his appeal before CAAF, petitioner merely adopted the pleadings filed before the Court of Criminal Appeals. (Attach. G at 57-59.) In short, petitioner argued that "[c]onsidering the facts presented at trial, a fully instructed panel may have believed that I was justified, was following orders. Was acting pursuant to duress, and that [I] was reasonably mistaken as to the danger, or some combination. The panel did not know they could absolve me of alleged criminal responsibility for these reasons." (*Id.* at 59.)[9]

---

[9] "In military jurisprudence, special defenses include justification, obedience to orders, self-defense, accident, entrapment, coercion or duress, inability, ignorance or mistake of fact, and lack of mental responsibility." *United States v. Mejia-Castillo*, No. 20040654, 2009 WL 6842543, at *6 (Army Ct. Crim. App. 2009) (unpub.); R.C.M. 916(c)-(k).

The record here demonstrates that at the close of evidence, petitioner's counsel affirmatively waived any instruction on lesser included offenses and likewise requested no further instructions beyond those which the judge intended to give. (Record of Trial, Vol. VIII at 791-808 (Attach. I).) The panel was ultimately instructed that the killings in this case must have been considered to be unlawful (*id*. at 829-30, 832 (Attach. J).) and that the panel could consider whether the killings were done in self-defense. (*Id*. at 840-44 (Attach. K).) At the end of the instructions, defense counsel reiterated that there were no other instructions requested by the defense. (Record of Trial, Vol. IX at 911 (Attach. L).)

Generally, a military judge retains appropriate discretion on how to instruct the panel; however, a military judge has a *sua sponte* duty to instruct on any affirmative defense that was reasonably raised. *United States v. Maynulet*, 68 M.J. 374, 376 (C.A.A.F. 2010). Importantly, the Court in *Maynulet* stressed that "'[t]he test whether an affirmative defense is reasonably raised is whether the record contains some evidence to which the court members may attach credit if they so desire.'" *Id*. at 376 (quoting *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000).) And, a military judge is not obligated to provide a certain instruction if the substance of that instruction is already "substantially covered"

by other instructions. *See, e.g., United States v. Carruthers*, 64 M.J. 340, 346 (C.A.A.F. 2007).

Here, petitioner's claim that the judge erred in failing to instruct on the special defenses of justification, obedience to orders, duress, and mistake of fact is simply without merit. To be sure, self-defense (an instruction given in this case) is a sub-species of justification; and, "[i]t is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful." R.C.M. 916(d).

As to coercion or duress, "it is a defense to any offense except killing an innocent person that the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act . . . If the accused has any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply" R.C.M. 916(h); *see also United States v. Washington*, 57 M.J. 394, 396-97 (C.A.A.F. 2002) (discussing the nature of duress in the military justice system).

Finally, R.C.M. 916(j)(1) describes those circumstances in which a service member may defend against a charged offense on the basis of a mistake of fact or ignorance:

> Except as otherwise provided in this subsection, it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only to have existed in the mind of the accused. If the ignorance or mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. However, if the accused's knowledge or intent is immaterial as to an element, then ignorance or mistake is not a defense.

In determining whether to instruct on mistake of fact or ignorance, "the military judge must decide whether the claimed mistake goes to an element of the offense requiring knowledge or intent. If so, the defense applies. If the accused's intent or knowledge is immaterial, then the defense does not apply." *United States v. Wilson*, 66 M.J. 39, 48 (C.A.A.F. 2008).

Here, none of the instructions that petitioner maintains were necessary were warranted under the facts of the case. And, under the circumstances, each of the claimed defenses merged with the instructions on self-defense and defense of others, which were properly given and specifically fit the facts of the case and the defense that petitioner was promoting.

Petitioner's arguments that the ROE warranted instructions on obedience-to-orders is also misplaced. Again, the ROE itself provided petitioner with the right to self-defense and defense of others; thus, the instructions on self-defense adequately covered this issue.

Petitioner's suggested duress instruction was also covered by the military judge's self-defense and defense-of-others instruction. To the extent a person can coerce an accused, with a threat to kill the accused, to kill the very person doing the coercing (a novel theory indeed), the duress defense is simply converted into self-defense; which, again, was the core of petitioner's defense, namely the defense of his platoon against threats of violence.

Finally, a reasonable mistake of fact as to whether a victim presents a threat of grievous bodily harm or death creates a defense that is co-extensive with self-defense and defense of another. A person who reasonably apprehends such a harm is protected by self-defense, even if his apprehension is mistaken. To also instruct on the defense of mistake of fact would be entirely redundant. Accordingly, each of petitioner's suggested instructions was substantially covered by the other instructions provided by the trial court.

The facts and circumstances of this case simply did not establish a sufficient reason for the judge to *sua sponte* instruct the panel on matters that were

covered by other instructions. To that end, the Court of Criminal Appeals were correct to summarily reject petitioner's arguments on this ground.

Because the panel instruction issue was fully briefed by the parties and considered by the Court of Criminal Appeals, this Court must deny petitioner relief under the review standard applied in this case.

B.   <u>INSUFFICIENT EVIDENCE</u>

For his final claim, petitioner alleges that the Army Court of Criminal Appeals did not adequately address the question of "whether an order to fire based on ROE-compliance at targets that were insurgent bomb makers can be murder or attempted murder in the combat zone. Neither did the Army Court consider that even if the Afghan victims were truly innocent civilians, that they were casualties of war under applicable international law categorized as "collateral damage," decisions which occur regularly when drone strikes kill innocent civilians. Nor did the Army Court evaluate the sufficiency of the remaining evidence after recognizing that [petitioner] was acquitted of changing the ROE, an analysis the Army Court never embraced." (Doc. 1, Pet. for Writ at 6.) This argument is wholly without merit, and the Court of Criminal Appeals was correct to reject it out of hand.

It bears repeating that petitioner's entire argument balances on the misguided assertion that he ***knew*** that the Afghans were terrorists at the time he

ordered the platoon to fire on them. The record, however, belies this argument at every turn. Moreover, the record is clear that the "SROE permitted soldiers to use force in defense of themselves or others [*__ONLY__*] upon the commission of a hostile act or the demonstration of imminent hostile intent. There were no declared hostile forces, and thus no authority to engage any person upon sight." *Lorance*, 2017 WL 28119756, at *1 (Attach. A.) Again, the evidence did not demonstrate, in any way, that the Afghan victims were enemy combatants, were engaged in a hostile act, or otherwise showing imminent hostile intent. And, even if they were known enemy combatants, petitioner still fails to assert a valid reason as to why he would have been authorized to attack them under circumstances where none of the men were engaged in either a hostile act or showing imminent hostile intent. Simply put, petitioner's argument is equally flawed even in the notional context. The Court of Criminal Appeals clearly understood and appreciated what petitioner was attempting to argue, and it was correct to soundly reject this claim.

Here, petitioner's convictions for murder and attempted murder are both factually and legally sufficient. The elements of unpremeditated murder are: (1) that a certain named or described person is dead; (2) that the death resulted from the act or omission of the accused; (3) that the killing was unlawful; and (4) that, at the time of the killing, the accused had the intent to kill or inflict great bodily

harm upon the person. MCM, pt. IV, 1 43b(2). The elements of an attempt are (1) that the accused did a certain act, (2) that the act was done with the specific intent to commit a certain offense under the code, (3) that the act amounted to more than mere preparation, and (4) that the act apparently tended to effect the commission of the intended offense. MCM, pt. IV, 1 4b.

First, the evidence is legally sufficient. The evidence showed that petitioner ordered his soldiers to fire on three civilians simply because they were riding a motorcycle and that two of the men died from their wounds. It was not irrational for the panel to find that petitioner intended to kill all three men and that two were dead. The evidence is thus legally sufficient.

Second, before taking over as platoon leader petitioner told a colleague he was running out of time to earn a CIB, which requires engaging in combat. (Record of Trial, Vol. VIII at 782, 784 (Attach. M).) His first acts upon taking over the platoon were to threaten the life of an Afghan child and to order the indiscriminate firing into the nearby Afghan village. (*Id.*, Vol. V. at 244-46, 256-66, 298 (Attach. N).) Next, despite being well versed in the ROE, petitioner falsely briefed his platoon that anyone riding a motorcycle was to be engaged. (*Id.*, Vol. V at 302; Vol. VI, at 362, 448, Vol. VII at 526-27, 628, 640 (Attach. O).) After he ordered the death of the three men, petitioner acknowledged that the engagement of all motorcyclists was not part of "our ROE." (*Id.*, Vol. V at

333-34 (Attach. P).) Petitioner showed his consciousness of guilt by taking a number of steps to conceal his crimes. (*Id.*, Vol. VI at 370, 372-73, 498; Vol. VII at 549, 552-54, 630-31, 709 (Attach. Q).) Once the crime was discovered he demonstrated his determination to commit the crime by insisting that if he ever got back to combat he would shoot every motorcycle he saw. (*Id.*, Vol. VI at 469 (Attach. R).) The court-martial, who saw and heard the witnesses, determined that there was no reasonable doubt as to petitioner's guilt based on these facts, and the Court of Criminal Appeals did not deem petitioner's claim to have merit.

For the foregoing reasons, this Court should reject petitioner's claim as it fails to satisfy the four conditions necessary for relief to be granted. *See Dodson,* 917 F.2d at 1252-53 n.1.

## **CONCLUSION**

Applying the aforementioned standard of review, Respondent submits that petitioner's arguments unquestionably received full and fair consideration by the military courts.

WHEREFORE, for the foregoing reasons, Respondent respectfully requests this Honorable Court to dismiss the Petition for Writ of Habeas Corpus with prejudice and deny all the relief requested.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney
District of Kansas

By:    /s/  *Jared S. Maag*
_____

JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
jared.maag@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2019, I electronically filed the foregoing Motion with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Carrie Elizabeth Parker
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
Email: cparker@josephhollander.com

Christopher Michael Joseph
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
Email: cjoseph@josephhollander.com

David G. Bolgiano
Maher Legal Services PC
7 East Main Street, Number 1053
St. Charles, IL 60174
Email: airbornerobocop@yahoo.com

Diane L. Bellquist
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
Email: dbellquist@josephhollander.com

John N. Maher
Maher Legal Services, PC
7 East Main Street, Number 1053
St. Charles, IL 60174
Email: johnmaher@maherlegalservices.com

By:    /s/  *Jared S. Maag*
JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney

34