# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CLINT A. LORANCE, | |
| Petitioner, | |
| v. | |
| COMMANDANT,<br>United States Disciplinary Barracks,<br>1301 North Warehouse Road<br>Fort Leavenworth, Kansas 66027, | Case No. 18-3297-JWL |
| Respondent. | |

## PETITIONER'S TRAVERSE

Lorance received neither a full nor fair review of his constitutionally-flawed trial and appeal before the Article I military courts. For example, following his convictions, and well after the opportunity to present important evidence to the jury, a new defense team discovered a series of shocking *Brady*[1] violations including evidence in the prosecution's possession that the dead and wounded "civilians" were actually enemy combatant terrorist bomb-makers.

The Justice Department's recent release of biometric fingerprint and DNA records as part of an ongoing Freedom of Information Act ("FOIA") lawsuit proves two victims and two material eyewitnesses were enemy combatant terrorist bomb-makers, information which should have been disclosed to the defense. *See* Petitioner's Motion to Expand the Record Per Habeas Rule 7 ("Exp. Mtn.") Exhibit (Ex.) 1(a) – (d) (DOJ released FOIA biometric records). The prosecution's failure

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

to disclose these records for the two victims and the two material eyewitnesses constitutes four *Brady* violations, each a constitutional violation and grounds to reverse Lorance's convictions and sentence.

The biometric records the government withheld, and the Justice Department produced only after suit, cast the prosecutor's act of crossing out the victims' names on the Charge Sheets in a more dubious light. It suggests the government knew of their enemy combatant status via terror evidence and sought to hide it. Exp. Mtn. Ex. 2 (Charge Sheets reflecting victims' names struck through in penmanship and initialed by the prosecutor).

Equally plausible is a rush to judgment and irresponsible prosecutorial decisions to bring double murder and attempted murder charges without confirming victim and eyewitness identities, especially where US paratroopers' use of deadly force occurred during a combat patrol in a combat zone where enemy combatants blend in with truly innocent civilians.

No matter the answer, the government deprived Lorance of Fifth Amendment constitutional guaranties, as set forth in *Brady* and its progeny of cases detailing a prosecutor's solemn duties to do justice, seek the truth, follow the evidence to its logical ends, and err on the side of disclosure.

Obscuring critical evidence did not end with the Charge Sheets. It extended to the platoon leader that Lorance replaced, Dominic Latino. Latino had been medically evacuated from the battlefield, having suffered peppering shrapnel wounds when an improvised explosive device ("IED") exploded. He wrote in a sworn statement given to the Criminal Investigation Command ("CID") on August 30, 2012, merely 30 days after the combat engagement giving rise to this case that, as platoon leader, he would never let a motorcycle near his unit for fear of the danger it posed. This testimony proves that Lorance's combat response was reasonable and lawful. That sentence,

favorable to Lorance and unfavorable to the prosecution, was lined out, without explanation. Exp. Mtn. Ex. 3 (Latino's sworn statement with motorcycle threat sentence struck in penmanship without explanation). Lorance's trial defense counsel, however, did not interview Latino nor call him as a witness.

The Army Court of Criminal Appeals ("Army Court") brushed aside Lorance's constitutional violations with biased and disingenuous rationales. The newly-discovered biometric evidence certainly could have changed the outcome of the trial and surely should have been considered in mitigation of punishment. Yet the Army Court dismissed the *Brady* violations by suggesting that the undisclosed biometric evidence was not relevant and that no theory of admissibility existed for the exculpatory and mitigating evidence. In a leap of supposition, the court suggested it could have actually been viewed as an aggravating factor. The claim is almost as shocking as the *Brady* violations themselves.

Additional *Brady* violations depriving Lorance of a fair trial include failure to disclose:

(1) An Army Significant Activity Report ("SIGACT") dated August 2, 2012, only 30 days after the events giving rise to the trial, which concluded that Lorance's platoon was being scouted for an impending attack or ambush, and that at least one enemy insurgent was killed, is a fifth *Brady* violation. Exp. Mtn. Ex. 4. The report, characterized as "update 9," suggests that at least eight prior iterations exist and potentially other updates beyond 9 exist. To the extent prior and subsequent versions of the report exist and were not disclosed, they too constitute multiple *Brady* violations.

(2) The identity of an aerostat operator, (blimp with a powerful camera floating above the battlefield to provide optics to protect US personnel), who observed three fighting aged males on foot armed with AK-47 assault rifles and talking on radios shadowing Lorance's platoon before

the motorcycle engagement. He made a written report and captured video footage of the scouting, which proves four additional *Brady* violations (identity, testimony favorable to the defense report, footage). Exp. Mtn. Ex. 5.

(3) The identity of Command Sergeant Major Gustafson ("Gustafson") who knew the members of Lorance's platoon personally, was their senior enlisted leader, had been on combat foot patrols with Lorance's platoon, and believes that Lorance's order to fire was not only reasonable, but also essential to protect his platoon, results in two additional *Brady* violations (identity and testimony favorable to the defense). Exp. Mtn. Ex. 6. Accordingly, there are no fewer than 11 *Brady* violations identified in this case.[2]

The Respondent ("Commandant") acknowledges that this Court has authority to issue a writ of habeas corpus under 28 U.S.C. § 2241 if Lorance were deprived of constitutional protections in Article I court-martial proceedings. *See Burns v. Wilson*, 346 U.S. 137, 139 (1953); *see also* Lorance's Petition, Doc. 1 at 7; Answer and Return, Doc. 13 at 11-12. Yet, the Commandant contends that a writ should not be issued, nor should a review be undertaken, because the Army Court afforded Lorance full and fair consideration of the claims raised in his habeas petition. The Army Court plainly did not.

Instead of full and fair review, the Army Court exacerbated a flawed investigation and trial process that was committed to fixing and affirming blame on Lorance, the Army's designated "bad

---

[2] In the Infantry, a Battalion Command Sergeant Major is the senior enlisted leader and command advisor responsible for issues affecting enlisted personnel. The prosecution did not disclose his identity nor the substance of his testimony favorable to Lorance and the defense did not exercise sufficient pretrial due diligence to identify and interview him to develop his testimony favorable to Lorance. The dual failure constitutes both a *Brady* and a *Strickland* violation.

apple."[3] Put differently, rather than conducting a probing review into the truth behind the events of July 2, 2012, in Kandahar, Afghanistan and adhering to binding Supreme Court standards, the Army Court rubberstamped Lorance's convictions, ignored Rules for Courts-Martial ("RCM") 916(c) ("killing an enemy combatant in battle is justified"), contorted rules of evidence, and refused to apply the Law of Armed Conflict (generally, civilians killed in combat are not murdered, rather, "collateral damage"), in reviewing constitutional deficiencies—including *Brady* violations, ineffective assistance of counsel, prosecutorial misconduct, and incomplete jury instructions—that occurred over the course of his court-martial.

This Court has an opportunity to remedy a grossly inadequate review of Lorance's unconstitutional court-martial and convictions. It should exercise its authority to expand the record, authorize discovery, and hold a hearing to receive evidence that will show both plain constitutional violations and a biased, unfair review of the convictions by Article I legislative courts. *See Hammon v. Ward*, 466 F.3d 919, 926 (10th Cir. 2006) (concluding district court abused its discretion in denying evidentiary hearing). A robust review of the proceedings by this Article III Court is the last chance to remedy clear injustices and obvious constitutional violations by Article I military courts.

---

[3] The phrase "bad apple" comes straight from the lips of Brigadier General Joseph Berger III, who in his capacity as Chief Judge of the Army Court, cited Lorance as an example of a "bad apple" who took it upon himself to change the Rules of Engagement to fire on any motorcycle on sight— despite the fact that Lorance had been acquitted of that charge before Berger made his statement. *See* Center for Strategic & International Studies, The My Lai Massacre History, Lessons, and Legacy: A Panel Discussion with Historians and Military Law Experts, Thursday, March 15, 2018, 1:30 p.m. – 3:30 p.m., CSIS Headquarters, *available at* https://www.csis.org/events/my-lai-massacre-history-lessons-and-legacy, last viewed August 29, 2019 (Lorance comments occur around the 1 hour, 12-minute mark and lasts to the 1 hour, 13-minute, 15-second mark).

I. **Lorance seeks review of convictions that were based on orders he gave during a combat patrol in Kandahar, Afghanistan—the "ancestral home of the Taliban"— which resulted in the death of a confirmed terrorist bombmaker, the wounding of another confirmed terrorist bombmaker, and the escape of a third confirmed terrorist bombmaker.**

On June 30, 2012, Lorance replaced a platoon leader after he suffered wounds from an IED explosion. On a combat patrol with the Afghanistan National Army ("ANA") three days after Lorance joined the platoon, Private First Class Skelton reported sighting a motorcycle with three riders speeding towards the platoon. He testified that, "[k]nowing the area that it was coming from, the first thought I had was it could be a drive-by shooting; it could be a drive-by grenade throw; it could be a vehicle borne IED." Trial Transcript pg. 537, Exp. Mtn. Exs. 7 - 8.

Lorance, who did not fire his weapon, authorized Skelton to shoot. Skelton fired and missed. Skelton's testimony at trial was inconsistent as to whether he fired in accordance with the Rules of Engagement ("ROE") or only on Lorance's command. *Compare United States v. Lorance*, No. ARMY 20130679, 2017 WL 2819756, at *1-3 (Army Ct. Crim. Appeals June 27, 2017) *with* Trial Transcript pgs. 576-78, 585-86, Exp. Mtn. Ex. 8

Anywhere from two to 15 seconds after Skelton fired but missed, according to five different witnesses, the platoon's gun truck that had overwatch of the platoon fired on Lorance's command. Trial Transcript pgs. 384, 497, 655, 658, 675, Exp. Mtn. Ex. 9.

The shots fired from the gun truck killed two riders and a third escaped unharmed. Skelton later reported potential civilian casualties when he recognized one of the deceased riders as a

village elder, leading to a military investigation of these events.[4] *See United States v. Lorance*, No. ARMY 20130679, 2017 WL 2819756, at *1-3 (Army Ct. Crim. Appeals June 27, 2017).

Coming on the heels of heightened local and international protests about civilian casualties, the investigation began hours after the July 2, 2012, combat patrol giving rise to this case. Exp. Mtn. Ex. 24 (Criminal Investigative Command Agent Activity Summaries). The prosecution took the platoon off the line to a rear area, separated them from Lorance (who had only been with the unit for 72 hours), gave Lorance an order not to communicate with the Platoon, then put the unit in a tent, and disarmed them as "suspects." *Id.*

The prosecution then accused nearly all of Lorance's platoon of murder without rights warnings advisements, (violations of Article 31(b), UCMJ), ordered the platoon to make written sworn statements in response to allegations of murder, and thereby set conditions to turn the platoon against Lorance to protect themselves, distance Lorance from the platoon, isolate him, and then hang murder charges over the platoons' heads to create the opportunity for grants of immunity and orders to cooperate in the case against Lorance, the "bad apple." *Id.*

The Army brought a general court-martial against Lorance. It preferred five charges: attempted murder in violation of Article 80 of the Uniform Code of Military Justice (UCMJ); making a false official statement a violation of Article 107, UCMJ (for allegedly instructing his soldiers the ROE had been changed to fire on any motorcycle on sight; murder in violation of Article 118, UCMJ specifying two separate killings of males "of apparent Afghan descent"; and

---

[4] Lorance's trial defense counsel did not interview Skelton to develop apparent impeachment evidence about Skelton's ostensible motive to report a civilian casualty to protect himself from heightened scrutiny about civilian casualties, given that he fired his rifle but Lorance did not.

conduct bringing discredit upon the armed forces, identifying five separate specifications allegedly supporting the charge.

Lorance was convicted of Charges I, III, and IV. (Doc. 13-5.) Lorance was found not guilty of Charge II, which charged Lorance with making a false official statement by misrepresenting a change in the ROE (to treat as hostile anyone on a two-wheeled motorcycle). (Doc. 13-5.) In other words, the panel concluded the Army failed to prove that Lorance made that misrepresentation.

In an opinion that reads more like a prosecution memorandum than balanced jurisprudence, the Army Court ignored this crucial jury acquittal and instead stated that Lorance had misrepresented a change in the ROE. It bears repeating: the Army Court noted that Lorance told his unit to fire on any motorcycle on sight, without mentioning anywhere in its affirmance that the jury found Lorance not guilty of that offense.

And with incredible ease, the Army Court brushed aside and discounted the significance of startling facts Lorance learned after he was convicted and sentenced to serve 19 years in prison. What he learned after his conviction included the fact that one of the deceased, the attempted murder victim, the injured Afghan (shot in the arm by Lorance's platoon during a second gunfight on the same combat patrol), and a material witnesses had all left biometric data on IEDs. That is, these people whom the prosecution had portrayed as civilians to the jury that convicted Lorance were actually enemy combatants because they left their fingerprints or DNA on IEDs. That status, in addition to Skelton's testimony at trial that he fired his rifle in compliance with the ROE, reveals that combat use of deadly force was justified. *See* RCM 916(c).

Though this information had been available to the prosecution during Lorance's court-martial proceedings, it was not disclosed. Nor was it produced in response to a defense request for criminal records of any Afghan involved in any way with the incident. Likewise, the prosecution

also sat on an intelligence report, or SIGACT, showing that Lorance's platoon was being set up for an ambush on that fateful day, and that at least one enemy was killed-in-action. What is more, Lorance's defense counsel ignored a credible eyewitness who voluntarily reached out to offer his personal observations of the enemy preparing to attack Lorance's platoon, as observed from his position as the "eye in the sky," that is an aerostat operator using a powerful camera to provide optics to American units operating on the ground.[5]

But the Army Court found no fault in his defense counsel. It summarily dismissed the other issues Lorance raised, although they demonstrated serious problems with the prosecution and identified deprivations of constitutional liberties.

Lorance comes before this Court requesting what he could not and did not receive before the military tribunals: a full and fair review of his case.

II.   **Habeas review is necessary to afford Lorance's claims—which address denials of essential constitutional protections—the full and fair consideration they were denied in the Article I military courts.**

A.   **A habeas petitioner is entitled to full and fair consideration of his claims.**

In *Burns v. Wilson*, the United States Supreme Court established that the writ of habeas corpus extends to a person incarcerated by a military process. 346 U.S. at 139. The plurality acknowledged the *sui generis* nature of military proceedings impacts the scope of civilian review. But the Court made clear that the Constitution protects service members "from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been

---

[5] It is widely known that there is an aerostat operator over nearly every battle space. Despite this, the prosecution did not reveal the operator's identity and defense counsel did not investigate. The dual failure constitutes both a *Brady* and a *Strickland* violation.

9

recognized and honored by the military courts as well as the civil courts." *Id.* at 142-43. And it announced that federal courts have authority to review and issue the writ in those cases in which the military decision failed to deal fully and fairly with allegations raised in the habeas petition. *Id.* at 139, 142.

The *Burns* decision did not further elaborate on what full and fair review entails. It did not address whether the type of review varied depending on the nature of the question being raised. Thus, the only standard articulated by the United States Supreme Court appears to be full and fair consideration, without distinction between whether the question presented is one of law, fact, or a mixture of the two. *See Arman v. McKean*, 549 F.3d 279, 290 n. 11 (3d Cir. 2008).

Subsequent Tenth Circuit opinions have attempted to define the parameters of what it means to fully and fairly consider a petition's allegations, ultimately concluding the *Burns* rule was "anything but clear." *Dodson v. Zelez*, 917 F.2d 1250, 1252 (10th Cir. 1990). In an effort to provide clarity, the Tenth Circuit adopted the four-factor test first articulated by the Fifth Circuit in *Calley v. Callaway*, 519 F.2d 184 (5th Cir.1975). *Dodson*, 917 F.2d at 1252. That four factor test for determining whether habeas review of a military conviction is appropriate asks the court to consider:  "(1) the asserted error is of substantial constitutional dimension; (2) the issue is one of law rather than of disputed fact already determined by the military tribunal; (3) there are no military considerations that warrant different treatment of constitutional claims; and (4) the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards." *Lips v. Commandant*, 997 F.2d 808, 811 (10th 1993) (citing *Dodson*); *see also Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670-71 (10th Cir. 2010) (citing *Dodson*).

Federal district court oversight of a military court's application of law can be particularly important when constitutional standards are implicated. As stated by a sister circuit, the "test of

fairness requires that military rulings on constitutional issues conform to Supreme Court standards . . . .” *Kaufman v. Secretary of the Air Force*, 415 F. 2d 991 (D.C. Cir. 1969); *see also United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 89 (2004). That is, Article III courts do not defer to Article I military tribunals’ constitutional rulings. *United States ex rel. New*, 350 F. Supp. 2d at 89. And exercise of habeas review may be required to ensure that military personnel are not deprived of the rights guaranteed by the United States Constitution.

Here, the Commandant argues that habeas review is precluded in this case because: (1) a litigant necessarily receives full and fair review if he raises an issue before the Army Court, even if it is summarily dismissed; and (2) a litigant waives all issues not raised before the Army Court. This “damned if you do, damned if you don’t” interpretation of Tenth Circuit case law must be rejected because it creates an unworkable standard that places challenge to a military tribunal’s decision beyond civilian court review, which is simply not the case. When explicitly authorizing habeas review in *Burns*, the Supreme Court could not have intended that the standard it announced would be applied in such ways as to make habeas review practically impossible, as the Commandant errantly suggests.

Recognizing that habeas review is available to military members, the Tenth Circuit has held a “constitutional claim is subject to our further review [when] it is both ‘substantial and largely free of factual questions.’” *Monk v. Zelez*, 901 F.2d 885, 888 (1990) (quoting *Mendrano v. Smith*, 797 F.2d 1538, 1542 n.6 [10th Cir. 1986]). This is because even the military must accord “‘its personnel the protections of basic constitutional rights essential to a fair trial and the guarantee of due process of law.’” *Id.* (quoting *Calley v. Callaway*, 519 F.2d 184, 203 [5th Cir. 1975]).

These are not just empty words, as the Commandant suggests them to be. Indeed, the Tenth Circuit has granted habeas relief to those service members court-martialed through a

constitutionally deficient process on multiple occasions. *E.g.*, *Monk,* 901 F.2d at 889-94 (reversing general court martial based on Tenth Circuit's conclusion that the reasonable doubt instruction was constitutionally deficient); *Dodson*, 917 F.2d at 1261-62 (reversing in part and remanding for resentencing that violated due process by failing to comply with UCMJ requirements).

In *Monk*, the Tenth Circuit reversed the district court's denial of a habeas petition. Solomon Monk, formerly known as David L. Martin, was convicted of the murder of his wife in a general court-martial. 901 F.2d at 886. Monk raised constitutional challenges in a habeas petition, which the district court denied. The Tenth Circuit reversed, finding "the military judge's reasonable doubt instruction was both defective and violated Monk's constitutional right to conviction only upon proof beyond a reasonable doubt." 901 F.2d at 887-88. Monk's challenge to the reasonable doubt instruction was rejected by a divided U.S. Court of Military Appeals (predecessor court to today's Court of Appeals for the Armed Forces or "CAAF"). *See United States v. Martin*, 13 M.J. 66, 67 (1979); *see also Monk*, 901 F.2d at 891 (discussing the split opinion). The Tenth Circuit engaged in extensive review of the contested instruction, the constitutional standard to be applied, and ultimately held that the defective instruction so infected the court-martial proceeding as to violate Monk's right to due process. 901 F.2d at 889-94.

And in *Dodson*, the Tenth Circuit again delved into the military court's decision and reversed in part the district court's denial of habeas relief. The issue in *Dodson* concerned interpretation of the UCMJ. Dodson's offense of conviction imposed a mandatory term of more than ten years. The UCMJ allowed conviction on a vote of two-thirds of the court-martial panel, but required a vote of three-quarters of the panel to impose any sentence over ten years. The Tenth Circuit found a statutory conflict between these provisions that the court concluded must be resolved in favor of the accused. 917 F.2d at 1255-56. The judge's instruction did not require a

12

three-quarters vote on punishment. 917 F.2d at 1261. The Tenth Circuit thus held the instructions fell short of the statutory requirement of a three-quarters vote on a sentence of over 10 years imprisonment. The Tenth Circuit concluded the failure to conform to statutory requirements violated defendant's right to due process, reversed the district court, and remanded to the convening authority. 917 F.2d at 1261-62.

More recently, the United States District Court for the Western District of Washington granted habeas relief requested by former Army officer Ehren Watada, who faced court-martial after he refused to deploy to Iraq based on his view that the war there was illegal. *Watada v. Head*, 530 F. Supp. 2d 1136, 1138 (W.D. Wash. 2007). Before Watada's case went to trial, the military judge accepted a stipulation of fact in which Watada agreed he *intentionally* "missed movement," a criminal offense under the UCMJ, in failing to board the flight that would take him and his unit to Iraq. *Id.* at 1139-40.

After Watada proposed an instruction on *mistake* as a defense to missing movement based on his belief he had a legal and moral obligation to refuse to participate in the war, the judge believed the instruction conflicted with the stipulated fact. The parties argued there was no conflict between the stipulated fact and proposed instruction. The judge disagreed. After extensive back and forth, the government moved for a mistrial. The judge granted the motion and set a new trial date. *Id.* at 1140-45. Watada moved to dismiss on double jeopardy grounds, which motion the military trial court denied. Watada appealed within the Article I military court system, but his appeals were denied. *Id.* at 1145-46. Watada then filed for habeas relief with the federal district court.

The district court determined that granting habeas relief was appropriate. *Id.* at 1147. The district court reviewed the four *Calley-Dodson* factors. It noted the double jeopardy issue presented

a substantial constitutional question that was an error of law independent from the military trial court's factual findings. The double jeopardy claims did not raise matters unique to the military. And finally, the court could not conclude the military court system gave full and fair consideration in light of the court's minimal analyses and the fact that it was "unclear whether the military courts applied the proper standard of review." *Id.* at 1150-51. After concluding it could properly review the military court's denial of the motion to dismiss the court-martial, the court addressed the merits of Watada's request for a preliminary injunction enjoining the military preceding against him in a second court-martial. The court ultimately stayed the court-martial proceedings and issued the injunction. 530 F. Supp. at 1151-61.

Jurisprudence regarding Article III civilian judicial review of Article I courts-martial supports granting a habeas petition when a substantial constitutional issue is raised, no (or minimal) factual disputes exist, no military factors require different treatment, or, the military court failed to properly apply relevant law.

Application of the *Calley-Dodson* factors shows that Lorance presents substantial constitutional issues, including *Brady* violations, *Strickland* ineffective assistance of counsel, prosecutorial misconduct, a failure to instruct on relevant affirmative defenses, and insufficient evidence to establish the alleged murders and attempted murder. The military court addressed the *Brady* violations and ineffective assistance arguments. But, as will be shown, it failed to apply the proper legal standards; thus, this court should grant review based on those factors alone. The military court also erred in summarily affirming the other grounds. Proper application of the relevant legal standards mandates relief be granted on those claims as well. The constitutional deprivations in this case are far more grievous than those in the cases discussed above in which Article III courts granted habeas relief to military petitioners.

14

**B. No full and fair consideration could be provided in this case because political pressure compelled the Army to hold Lorance legally accountable for the deaths that occurred on July 2, 2012.**

Habeas review is also necessary because no full and fair consideration could be provided to Lorance in the military court system. None of the cases on which the Commandant relies in requesting that this Court deny Lorance's petition involved a situation in which a branch of the military was committed to prosecuting, convicting, and affirming convictions of one of its own to avoid political fallout because of then-existing conditions on the ground. It is in light of this background that the court must consider the sufficiency of the Army Court's discussion of the legal and factual issues presented in this case.

**1. Political fallout from civilian casualties in the months prior to July 2012 infected the Army's response to Lorance's actions.**

In March 2012, an American soldier killed sixteen Afghan civilians, including women and children, at night in their homes. Worldwide media and political attention followed.[6] Afghan President Karzai condemned the killing as "murder and terror and an unforgiveable action." *Id.* The Government of the Islamic Republic of Afghanistan (GIROA) complained to the United States and Coalition nations. The National Assembly of Afghanistan called for the soldier to be tried in Afghanistan. *Id.* He was instead court-martialed. Upon entering a guilty plea (entered into to avoid the death penalty after a competency board did not consider the effects of mefloquine, an anti-malarial drug now known to cause long term psychotic effects,

---

[6] *See e.g., U.S. soldier who killed villagers should be put on trial in Afghanistan, parliament demands*, The Telegraph (Mar. 12, 2012), *available at* https://www.telegraph.co.uk/news/worldnews/asia/afghanistan/9137937/US-soldier-who-killed-villagers-should-be-put-on-trial-in-Afghanistan-parliament-demands.html.

on the accused's *mens rea*), he was convicted of murdering 16 and wounding 6. *United States v. Bales*, 2017 WL 433103, at *1 (Army Court Sept. 27, 2017) (unpublished opinion).

In June 2012, another soldier shot and killed a farmer and his daughter in the Zharay District, prompting Afghan President Hamid Karzai to personally travel from the capital, Kabul, to the Zharay District to publicly express outrage over civilian casualties at the hands of American personnel. Huber Decl. ¶¶ 19-22, Exp. Mtn. Ex. 5.

In the wake of these incidents immediately preceding July 2, 2012, Army officials certainly felt compelled to rehabilitate the Army's image and responded aggressively to allegations of potential civilian casualties. With political pressure at an all-time high, the Army was making condolence payments to local Afghan families in July 2012, rather than affording Lorance a presumption of innocence until proven guilty. It had to make an example of him.

> **2. Statements in the Army Court's decision and statements by two of the most senior uniformed legal officers in the Army evince adherence to a politically driven *post-hoc* narrative rather than full and fair judicial process compliant with the Constitution.**

Early on, the Army developed an official narrative painting Lorance as a rogue bad actor who took it upon himself to change the ROE to fire on any motorcycle on sight. This Charge (Article 107) formed the crux of the prosecution's case, the idea being, if Lorance did so, arguably every round fired at a motorcycle could result in murder or attempted murder. This official narrative, echoed by the government on direct appeal, was adopted by the Army Court in its affirmance and later again echoed by two senior-uniformed legal officers with supervisory authority over that reviewing court. The military's ardent commitment to this official narrative, despite being confronted with proof of its infirmities and departures from basic constitutional

standards, shows there was no way Lorance could receive full and fair consideration of his constitutional challenges.

As part of its campaign to identify and punish Lorance as their sacrificial bad apple, the Army alleged that Lorance unilaterally changed the ROE to allow paratroopers to fire on any motorcycle on sight (Doc. 13-5.)  This was the core of the Army's theory of the case, drilled in at opening and closing. Trial Transcript pgs. 132-33, 139, Exp. Mtn. Ex. 10. [opening]; 853-54, [closing], Exp. Mtn. Ex. 10. Some of the soldiers testified as much during the court-martial. Trial Transcript pgs. 301, Exp. Mtn. Ex. 11.

But others testified that Lorance did not change the ROE in any respect. Rather, they testified, it was the Afghan National Army that had announced it was changing its approach. Trial Transcript pgs. 250-51, Exp. Mtn. Ex. 12. In the end, jury returned a not-guilty verdict on the charge that Lorance unilaterally changed the ROE. (Doc. 13-5) (Court-Martial Order No. 29 reflecting panel's not guilty finding).

Despite the disputed testimony and ultimate acquittal, the Army Court toed the official line in its opinion in this case. It began its background discussion with the Chairman of the Joint Chiefs of Staff's Standing Rules of Engagement then in effect. *See Lorance*, 2017 WL 2819756, at *1. When the Army Court returned to discuss the allegation that Lorance unilaterally changed the ROE, the Army Court said merely that the testimony "was somewhat inconsistent." The Army Court opinion conspicuously omits the fact that Lorance was acquitted of that very charge which formed the lynchpin of the prosecution's theory of the double murders and attempted murder charges.

The official line about Lorance changing the ROE has been repeated in public comments, preserved for review, notably by Brigadier General Joseph B. Berger III, the Chief Judge of the

Army Court. As the Chief Judge, Berger had supervisory control of the Army Court and evaluated its judges along with Lieutenant General Charles Pede, the senior-most uniformed legal officer in the Army. In public comments, Berger represented that Lorance was "a bad apple" who told his paratroopers that the ROE changed and they could fire upon any motorcycle. Berger did not qualify his statements by acknowledging the disputed testimony. Nor did Berger acknowledge that Lorance was acquitted on this count. Instead, he repeated as gospel the accusation that Lorance unilaterally changed the ROE because he was "off the rails."

And he did so in dress uniform in his capacity public comments discussing the massacre at *My Lai*, creating a false equivalence between: (1) "the *My Lai* incident in South Vietnam, where a large number of defenseless old men, women and children were systematically shot and killed by Calley and other American soldiers in what must be regarded as one of the most tragic chapters in the history of this nation's armed forces," *Calley,* 519 F.2d at 189-90; and (2) Lorance's authorizing shots to be fired at three men of military age riding tandem on a motorcycle at a high speed on a road most frequently used by persons hostile to American and coalition forces and known to cover buried IEDs after his platoon had been attacked on nearly every patrol in the preceding months and the most recent attacks resulted in four debilitating casualties.

Berger notably made these public comments while the Lorance's case was pending review before the Secretary of the Army. Lorance requested corrective action by Berger; none came. Exp. Mtn. Ex 13. (Letter to Berger pointing out Lorance was found not guilty of changing the ROE and asking for corrective action before the Secretary of the Army took action upon review).

After Lorance's written request for corrective action, Lieutenant General Charles Pede, the most senior uniformed legal officer in the Army who appointed Berger to his position as Chief Judge, made the same misrepresentation. Pede shares with Berger supervisory control of the Army

Court and evaluates the Judges on the Army Court. Pede represented that Lorance unilaterally changed the ROE to Congressman Garrett Graves of Louisiana during a telephone call in Spring 2018, in an apparent effort to dissuade Graves from supporting Lorance. Pede did not mention that Lorance has been found not guilty, and largely echoed Berger's March 2018 comments. Although initially open to providing affidavits establishing these facts, the Congressman and his chief of staff were advised by counsel to wait until subpoenaed to testify to this information or provide their sworn declaration.

The Commandant does not deny or otherwise refute any of this in her answer.

The military process in this case was designed to solidify an official narrative and save face politically; it was not due process designed to fully and fairly evaluate whether an American soldier was afforded the protections guaranteed by his government and his Constitution. It is against this background that this Court must consider whether Lorance's claims received full and fair consideration.

III.   **The prosecution violated *Brady* when it did not disclose: (a) evidence linking a murder victim, an attempted murder victim, and two material eyewitnesses by fingerprint and DNA evidence to IEDs; (b) a Significant Activity Report proving the enemy was on the field and preparing an ambush on July 2, 2012, and that one enemy was killed; (c) an aerostat operator's report and film that he observed three fighting-aged males armed with AK 47 assault rifles shadowing Lorance's platoon before the motorcycle engagement, and (d) evidence favorable to Lorance from Command Sergeant Major Gustafson.**

The Army charged Lorance with numerous criminal violations, the most serious of which were two charges of murder and one charge of attempted murder. Murder as defined in this case is the unlawful killing of a human being without justification or excuse. *See* UCMJ art. 118, *codified at* 10 U.S.C. § 918; *see also* UCMJ art. 80, *codified at* 10 U.S.C. § 880 (defining attempt offenses). The critical issue in this case was whether the killings or attempt were unlawful or

without justification or excuse. Here, that determination hinged on whether any of the deceased or injured were enemy combatants or whether the three persons riding the motorcycle posed a threat that warranted the use of deadly force in defense of self or others. *See* RCM 916(c) ("A death, injury, or other act caused or done in the proper performance of a legal duty is justified and not unlawful."); *id.* Discussion ("killing an enemy combatant in battle is justified"); *see* RCM 916(e) (elements of self-defense); RCM 916(e)(5) (defining defense of another). Thus, any evidence tending to show the decedents or injured posed a threat to Lorance and the unit was relevant in this case, as was any evidence the deceased or injured were enemy combatants. It is against this legal background that the Court must consider the prosecution's *Brady* violations in this case.

A. **Prosecutors' special role in the search for truth requires that they make reasonable efforts to locate and disclose evidence favorable to the defense, even without a specific request; when favorable evidence suppressed by the prosecution could reasonably have put the whole case in a difference light, confidence in the verdict is undermined reversal is required.**

It is well established that constitutional due process guarantees obligate the prosecution to disclose material favorable evidence to the defense. *Brady*, 373 U.S. at 83. The evidence must be produced when it is material to issues of guilt or punishment. And the prosecution's good or bad faith in failing to produce the evidence is irrelevant. 373 U.S. at 87. When such evidence exists, due process requires the evidence be disclosed to the defendant.

In considering whether a *Brady* violation occurs, the court should consider the "cumulative effect of all such evidence suppressed by the government." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). When the net effect of withheld evidence "raises a reasonable probability that . . . disclosure would have produced a different result," the defendant is entitled to a new trial. 514 U.S. at 422. A defendant shows a *Brady* violation when he establishes "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence

in the verdict." 514 U.S. at 435. There is no need to engage in a harmless error analysis. *Kyles*, 514 U.S. at 435-36.

Prosecutors have a "special role … in the search for truth in a criminal trial." *Banks v. Dretke*, 540 U.S. 668, 696 (2004). This special role requires prosecutors to disclose evidence that is favorable to the defense "even without a specific request." *United States v. Agurs*, 427 U.S. 97, 110 (1976).  It is no excuse that the evidence was not requested or requested only in a general way. The government's duty mandates disclosure of exculpatory evidence. *See Kyles*, 514 U.S. at 433.

And that duty exists even when law enforcement fails to bring that favorable evidence to the prosecutor's attention. *Kyles*, 514 U.S. at 421. The Supreme Court makes it clear that prosecutors must resolve doubt in favor of disclosure. *Kyles*, 514 U.S. at 439; *accord Agurs,* 427 U.S. at 108. As the *Kyles* Court acknowledged, "[s]uch disclosure will serve to justify trust in the prosecutor as the 'representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" 514 U.S. at 439 (quoting *Berger,* 295 U.S. at 88).

Each individual prosecutor is responsible for gauging the likely net effect of evidence disclosed. The Supreme Court has interpreted this duty to extend to learning "of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. When the military trial counsel knows *or has reason to know* he or others acting on the government's behalf may have exculpatory information, trial counsel's duty to disclose that information is triggered. In other words, trial counsel cannot remain willfully blind by failing to conduct a reasonable investigation into potentially exculpatory information. *United States v. Stellato*, 74 M.J. 473, 487-88 (CAAF 2015) (no abuse of discretion in determining government violated RCM 701[a][6] (which incorporates *Brady* into military practice) by failing

to disclose information in possession of a cooperating witness that trial counsel knew was available for review but failed to investigate).

**B. The Army Court misapplied *Brady* and thus failed to give full and fair consideration to Lorance's claim that due process required the prosecution to disclose readily accessible information linking the "victims" and witnesses to IEDs.**

The prosecution purposely portrayed the alleged victims as mere civilians, rather than enemy combatants, terrorists, or bombmakers. To that end, the prosecution repeatedly used terms like "CIVCAS," an acronym for civilian casualties. The prosecution portrayed the alleged victims as common farmers innocently traveling from one place to another—though they did so near an American combat patrol in a minefield from a direction known to be regularly traveled by Taliban and at an excessive speed. Examples of the prosecution's attempts to establish the victims here were not involved in hostilities against American troops and their allies include:

- Repeated references to one victim as "the village elder," including in opening argument. (R. at 144; 318; 323; 517).

- Eliciting testimony that "the common farmer," "farmers," and "normal people" used motorcycles. (*E.g.*, R. at 224 [First Lieutenant Charles Jones]; R. at 788 [First Lieutenant Katrina Lucas]).

- Eliciting testimony that "they [motorcycle riders] were civilians." (R. at 315-16).

- Stating in closing that there "is no suggestion that they were Taliban," rather, "they were … men with families." (R. at 855).

While portraying the riders as "normal" Afghans who were "farmers," in contrast to Taliban or enemy combatants, the prosecution had ready access to contradictory information. And it was not in "the abyss" as the Army Court would have one believe. In fact, this information was

in well-known and commonly-used databases called NGIC for National Ground Intelligence Center, or ABIS or A-ABIS, the Automated Biometrics Identification System or Afghanistan Automated Biometrics Identification System. All the prosecution had to do was simple database searches for the names of the alleged victims and material witnesses in this case. Habeas Petition, Doc. 1, 26-27, 52-53, 58-60.

Indeed, it seems only reasonable that, before the Army would put one of its own on trial for killing "innocent civilians" in a combat zone where the enemy combatants blend in with the local population, it would use the tools at its disposal to confirm that fact. Instead, due to then-existing conditions on the ground (as discussed above), the Army willfully elected to remain ignorant of the victims' and witnesses' connections to terrorism (leaving their fingerprints and DNA on IEDs). That, or the Army knew, but chose not to disclose, that fingerprint or DNA evidence showed that two of the riders, KARIMULLAH who escaped (attempted murder victim) and GHAMAI (murder victim) made improvised explosive devices. That is, they left their prints or DNA on bomb components.

Also on government databases were reports that a material eyewitness, RAHIM (shot in the arm by Lorance's Platoon during the second engagement that morning on the same patrol), and a material witness, AHAD, left their prints and DNA on bomb components. Not only did Lorance present the Army Court with this uncontested evidence, records the Justice Department released through a subsequent FOIA litigation in Washington DC have confirmed the bombmaking activity. Exp. Mtn. Ex. 1 (two victims and two material eyewitnesses left prints or DNA on IEDs).

This information, combined with information indicating familiar relationships among the alleged victims and the other material witness as family members create a very different impression of the individuals killed and injured here. (*See* R. at ROI Number 0254-12-CID379-77688, at 4-5

23

entry made by Special Agent Rasmussen. [AHAD identified his father, brother, and uncle as the persons on the motorcycle and Rahim his brother in law, and connected the motorcycle riders with the second engagement that morning to the North of the Village].)

When read together with the undisclosed SIGACT (platoon being scouted for impending attack or ambush), the undisclosed aerostat (three fighting-aged males on foot armed with AK-47 assault rifles and talking on radios), three riders approaching an American combat patrol in a minefield from the north and east on a known enemy avenue of approach, and Lorance's platoon killing two others and wounding a third to the north, not only establishes that Lorance's unit was being probed for attack, but also that Lorance's combat decision to rely on Skelton's ROE threat assessment was reasonable, or, as Gustafson swears in his declaration, "essential" to protect the platoon.

The Army Court denied Lorance a hearing. In its written affirmance, the Army Court discounted the biometric evidence (undisputed by the government on appeal) as irrelevant, unfavorable to the defense, and inadmissible under any theory of evidence. 2017 WL 2819756, at *4-5. In a refrain repeated by the government in its answer and return, the Army Court concluded the facts that a decedent, the uninjured rider, and two material witnesses left their fingerprints and DNA on IEDs were immaterial because Lorance did not know that at time. 2017 WL 2819756, at *4-5; Doc. 13, Answer and Return, 19. Both are wrong and both constitute misapplication of the *Brady* standard of review and grounds for review and reversal of Lorance's convictions and sentence[7]

---

[7]  *See e.g., United States v. Ford*, 550 F.3d 975, 999 (10th Cir. 2008) (dissent by now Justice Gorsuch addressing an alleged *Brady* violation in a 2255 habeas petition, explaining that "[t]he court's misapplication of the *Brady* standard of review is also revealed in its exclusive focus on the government's evidence on count 3 without reference to the jury's disposition on counts 1 and 2.");

Under the RCM, "killing an enemy combatant in battle is justified." Discussion, RCM 916(c). Period. The RCM does not impose any requirement that the soldier know the person is an enemy combatant at the time of the killing. Because killing an enemy combatant is justified and, by definition, not murder, the evidence tying the alleged victims and material witnesses to terrorism could have been used by the defense to show a complete legal justification for Lorance's actions. That is, the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The Army Court's holding to the contrary misapplied *Brady* and its progeny.

And critically, the Army Court made no mention of mitigation in its *Brady* analysis. In this regard, it again failed to apply established constitutional law. *Brady*, 373 U.S. at 87 ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt <u>or to punishment</u>, irrespective of the good faith or bad faith of the prosecution.").

Evidence that the alleged victims were in fact enemy combatant terrorist bomb makers could have mitigated the jury's findings and surely lessened if not totally diminished any punishment imposed by supporting the position that, even if Lorance acted in a manner the panel concluded violated the UCMJ, his judgment of the threat posed was correct and an enemy combatant taken out as a result.

---

*Trammell v. McKune,* 485 F.3d 546, 552 (10th Cir. 2007) (agreeing with the district court judge that the state court misapplied the *Brady* standard, finding the withheld evidence material, and reversing the petitioner's conviction).

Moreover, the prosecution claimed the victims were civilians, thereby "opening the door" for evidence that they were enemy combatant terrorist bombmakers relevant to rebut the prosecution's theory of illegality. These failures, especially the refusal to acknowledge the evidence's relevance to sentencing mitigation, constitutes yet another misapplication of the *Brady* standard of review by the military courts.

The Army Court also side-stepped the fact that Lorance reasonably relied on Skelton's ROE threat assessment to give his combat orders to fire, and that the fatal rounds struck within 2 – 15 seconds from Skelton's missed volley. Trial Transcript pgs. 384, 497, 655, 658, 675, Exp. Mtn. Ex. 9. On this alone, the jury could have found Lorance not guilty of double murder and attempted murder. Factor in the suppressed evidence, that ROE-compliant shots hit enemy combatants, (RCM 916 "killing an enemy combatant in battle is justified"), and the prosecution's capital case is extinguished.

Had the prosecution disclosed the biometric evidence, the defense could have used it for other compelling pretrial or trial uses, such as retention of a biometric expert to determine how many US personnel were killed or maimed by the bombs that the Afghans on the field emplaced (established by GRID coordinates, IED event reports, link-charts, dates, and SIGACTs).

The Army Court's analysis of Lorance's biometric *Brady* issues failed to accord Lorance the full and fair review he was entitled to receive under the Constitution.

### C. The SIGACT report rebuts the prosecution's claims and proves enemy combatants were planning an ambush and attack Lorance's platoon.

In U.S. Army databases, a document entitled "SIGACT," (acronym for Significant Activity Report," dated August 2, 2012 (a mere *30 days* after the combat patrol giving rise to this case), concluded that Lorance's Platoon was being scouted for an impending attack or ambush and that

at least one insurgent fighter was killed in action. Exp. Mtn. Ex. 4. While the prosecutor repeatedly urged the jury to conclude that the riders were not enemy combatants, the Army's own report directly contradicts those assertions and concludes that the enemy was on the field on the morning of July 2, 2012. The report, characterized as "update 9," suggests that at least eight prior iterations exist and potentially other updates beyond 9 exist. Attached as part of Lorance's motion to expand the record pursuant to Habeas Rule 7, relevant parts of the report are produced here:

> [Date of Incident] 2012-07-02; (update 09) At 0619D* C-Troop CAV received ICOM [Handheld Radio/Integrated Communications] ***Chatter indicating a pending ambush on a combined patrol moving toward an INS [Insurgent] position.*** The ICOM chatter lasted for nearly 90 minutes. At 0707D* C/S [Combat Support] engaged 2-3 fighting aged males with direct fire. At 0755D* C/S reported a second engagement. The Support by Fire Element engaged 3x INS with SAF [Small Arms Fire] based on the ICOM chatter of ***the pending ambush***. Unit in contact confirmed ***1x EKIA*** [Enemy Killed in Action] and 1 AFG WIA [Afghan Wounded in Action] as a result of the engagement. At 0832D* C/S began treating the ***1x AFG WIA*** and detained an additional POI [Person of Interest] who was fleeing the area. The AFG WIA and the POI who was detained ***both tested positive for HME [Homemade Explosives]*** during an X-Spray Test (HME Detection Test). 12 JUN CIVCAS [Civilian Casualty] Assessment has been completed. Findings are in the CAR [Command Assessment Review], NFTR [Nothing Further to Report]. Afghanistan/Kandahar/Zharay ***1 Killed Insurgent Confirmed***, 1 Detained CIV AFG [Civilian Afghan] Confirmed, 1 Wounded CIV AFG Confirmed, 2 Killed CIV AFG Confirmed

Exp. Mtn. Ex. 4. (emphasis added).

According to this document, which was in the prosecution's possession, custody, and control, Lorance's Platoon was heading toward an insurgency position and right into an ambush. While portraying the three riders as farmers and civilians, the prosecution sat on this report showing enemy combatants were planning to attack Lorance's Platoon at the very time Skelton

perceived the deadly threat and Lorance gave the combat order to fire on the motorcycle and its three riders charging their position.

That the Platoon was literally walking into an ambush while patrolling through a minefield is highly relevant of the reasonableness of Lorance's perception at the time: *i.e.*, that when he ordered the gun truck to fire, he perceived a threat to his Platoon. Therefore, his split-second decision was made in self-defense and defense of others—both complete defenses to murder and attempted murder. At minimum, the information regarding the killed and wounded Afghans' status as bomb-makers, not innocent civilians, were relevant at trial. Even if the jury had decided to convict Lorance in spite of such evidence, it would undoubtedly have mitigated any sentence, as the evidence demonstrates that Lorance's Platoon was operating amidst constant threats that informed his decision making.

Tellingly, the Respondent's Answer and Return completely ignores the SIGACT report and its potential to have dramatically affected the proceedings in favor of Lorance. The Commandant's silence on this issue speaks volumes. There is no defense to the prosecution's failure to turn over such crucial information.

**D. The aerostat operator's sworn declaration, that from his view of Lorance's platoon using a powerful camera showed three fighting aged males armed with AK-47 assaults rifles and talking on radios shadowing Lorance's platoon before the motorcycle engagement, reveals additional *Brady* violations.**

Mr. Kevin Huber's ("Huber") sworn declaration is attached as part of Lorance's motion to expand the record. Exp. Mtn. Ex. 5. Huber was serving as a government contractor in the Zharay District of Kandahar Provence, Afghanistan as an Aerostat Operator. An aerostat is essentially a floating blimp with cameras, commonly known to American Forces as "the eye in the sky." Huber

Decl. ¶ 2. His airship was capable of up-close, positive identification of people on the ground at a distance up to 5.5 kilometers away. It also streamed high-definition video. *Id.* ¶ 3.

On the morning in question, Mr. Huber "saw three fighting-aged males shadowing the American patrol at a distance of about 300 meters. In [his] experience, they had every indication of Taliban or insurgent fighters because they were armed with AK-47 assault rifles and using ICOM radios while moving along the back wall of the village toward the American position." *Id.* ¶ 12.

Mr. Huber "filed a report about [his] observations the morning of July 2, 2012, and a videotape of what [he] observed through [his] camera was preserved." *Id.* ¶ 22.

There is no dispute the prosecution had access to this material, exonerating, and mitigating, evidence favorable to Lorance and that the prosecution failed to disclose this material witness' existence, his report, or the footage he preserved of Lorance's platoon being scouted by enemy combatant attackers. There is no defense to the prosecution's failure to turn over such crucial information.

### E. The prosecution committed still other *Brady* violations when it failed to disclose the testimony of Command Sergeant Major Gustafson, whose sworn declaration makes it clear that Lorance's combat order was reasonable and that the prosecution sought to unlawfully make an example out of Lorance.

The prosecution also failed to disclose as a witness favorable to the defense former Command Sergeant Major Gustafson, who would have offered testimony not only as to Lorance's ability and judgment, but also the tense, Taliban-infested environment in which Lorance's platoon operated. As a senior enlisted leader, veteran of direct gunfights on the very field at issue, with 31 years' Army experience, and firsthand knowledge of many members of Lorance's platoon, Gustafson's sworn declaration, attached as part of Lorance's motion to expand the record, makes

clear that Lorance's actions were reasonable and justifiable. Exp. Mtn. Ex. 6. Gustafson states that Lorance was sharp, smart, proficient, and that from many others who could have been selected to replace the wounded platoon leader, the unit chose Lorance because he was a stand-out. Gustafson Decl. ¶¶ 11 – 13; 19.

Gustafson's testimony provides further certainty that Lorance's platoon was being scouted from the east, north, and west for a "coordinated attack," that Skelton would not have fired his rifle unless he perceived an actual threat, and that under the same circumstances, Gustafson would have ordered his paratroopers to fire and that he too would have fired his rifle at the motorcycle. *Id*. at ¶¶ 21-29.

Revealingly, Gustafson, based on his interactions as senior enlisted leader with the company, battalion, and brigade commanders, exposes the true intent behind the prosecution of Clint Lorance as not seeking to impose legitimate punishment, but instead driven by the potential negative impact on the chain-of-command's careers if they were somehow responsible for still more civilian casualties (*i.e.,* the Kandahar massacre a few months prior and President Kharzai's visit in June 2012 to Zharay to express outrage at Americans killing civilians).

Gustafson notes, "[t]he Chain of Command failed this young man [Lorance]. They used him as the scape goat at a time in Afghanistan when the Commanding General in country was looking to hold someone accountable because of other Civilian Casualties (CIVCAS) that had occurred in other locations prior to this. Clearly the Division Commander, the Brigade Commander and the Squadron Commander aren't going to take the responsibility." *Id*. ¶¶ 30-31.

"By design, they distanced themselves from Lorance, cut him loose, turned their backs, and started the narrative that he was "off the rails," bloodthirsty, and a "bad apple" bent on indiscriminate murder, in order to protect their careers." *Id*. ¶ 41.

Gustafson offers the following comments that stood to change the landscape of the trial to Lorance's favor: "[Lorance] made the right choice. He was wrongfully punished and those senior leaders go about their business, go home to families, and continue their careers." *Id.* ¶ 36.

> As a career Soldier with substantial time in the 82nd Airborne Division, I know that if the jury knew that Lorance's order killed terrorist bombmakers, that would have been viewed as exonerating, justified a verdict of not-guilty, and eliminated any possibility of punishment.
>
> * * * * *
>
> Personally knowing many of the Platoon's Soldiers, and based on my 31 years of serving with and leading Soldiers, I am totally confident that had each of the witnesses against Lorance learned that fingerprints and DNA proved they were terrorist bombmakers, their testimony would have been more favorable to Lorance and less favorable to the prosecution.

*Id.* ¶¶ 37-38.

There is no dispute that the prosecution knew of this witness but failed to disclose his identity or the substance of his exculpatory and mitigating testimony. Moreover, having the senior enlisted advisor for the battalion testify that, "I was there. This was my unit. I walked that village. I know Lorance is NOT a rouge officer on a mission to kill," *id.* ¶ 43, would have transformed how the jury perceived Lorance and his combat decision from unlawful to lawful and dutiful.

### F. Relief is necessary because the cumulative effect of undisclosed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

This Court must consider the cumulative effect of all suppressed evidence to determine whether the net effect of such evidence "raises a reasonable probability that . . . disclosure would have produced a different result." *Kyles*, 514 U.S. at 422. Where, as here, the net effect raises that

reasonable probability, a constitutional violation has occurred warranting the court granting Lorance habeas relief.

The cumulative effect of the suppressed evidence obliterates the prosecution's case against Lorance. It shows the alleged victims were not the innocents the prosecutor made them out to be and indicates they were involved in a coordinated attack. At least one "victim" was confirmed to have been involved in IEDs before he was killed; another's biometric data was recovered from IEDs after July 2, 2012, but before trial. Although the other's biometric data has not yet been found on a bomb, he not only associated with two bomb makers but rode with them on a single motorcycle at an excessive speed through a minefield at a time when the Army knew the platoon was being scouted for an attack.

This evidence is material to establishing a justification defense. This evidence is also exonerating because it tends to prove the reasonableness and legality of Lorance's combat order and would have established a defense of coercion or duress or mistake. RCM 916(h) & (j). No reasonable court reviewing this case, knowing what is known now, can stand by idly and allow Lorance to remain in prison. This is precisely the type of case that calls out for Article III judicial review, and relief in the form of disapproving the findings and the sentence. 28 U.S.C. § 2243 (the Court is authorized to grant relief as law and justice require).

Even if the legal defenses describe above were not in play, this evidence was made material by the prosecution's insistence on portraying the Afghans as innocent farmers. The prosecutor also aggressively portrayed Lorance as "manufactur[ing] combat," Trial Transcript p. 132, Exp. Mtn. Ex. 14, and intent on indiscriminate murders, mischaracterizations that could have been readily and soundly defeated had this information been disclosed as required. This contradictory evidence

supplies a substantial basis for taming and mitigating these aggravating arguments. RCM 1001(c)(2) (C) (defining mitigation).

In its review, the Court should consider the prosecution's withholding of the aerostat operator's testimony, report, video footage, and Gustafson's testimony that Lorance's actions were reasonable and lawful. None of this evidence was disclosed to the defense at any stage of the proceedings.

Due Process required disclosure of the fingerprint and DNA evidence, the SIGACT report, the aerostat evidence, and Gustafson's identity and testimony.  The evidence the prosecution left undisclosed provided various grounds for acquittal. Further, the suppressed evidence would have allowed the defense to put it to numbers of uses - to attack the reliability, thoroughness, and good faith of the prosecution's investigation, to impeach the credibility of the prosecution's witnesses, and to bolster the defense case against prosecutorial attacks, and during opening and closing statements *Kyles*, 514 U.S. at 442 n.134; 445-451.

The Army Court's conclusions to the contrary are the result of misapplying *Brady* and its progeny. Pursuant to *Kyles*, a *Brady* violation is not subject to a harmless error analysis and entitles a Petitioner to reversal. *Id*. at 435-36. Here, as discussed more fully above, the prosecution committed no fewer than 11 *Brady* violations and the misapplication of law deprived Lorance of full and fair consideration of his *Brady* claims in his Article I appeal.

Accordingly, before the court are numerous and substantial constitutional grounds on which to disapprove the findings and sentence pursuant to 28 U.S.C. § 2243, and free Lorance from continued unlawful incarceration by Federal officials (the Court is authorized to grant relief as law and justice require).

IV.    **Lorance was denied constitutionally effective assistance of counsel by a defense team whose failure to reasonably prepare and investigate caused actual prejudice, and the Army Court failed to fully and fairly review his claims in this regard.**

A.    **When counsel fails to adequately prepare for trial and investigate evidence potentially relevant to defenses or mitigation, he deprives the defendant of the effective assistance of counsel the Sixth Amendment guarantees.**

The Supreme Court established the rubric for ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the court held the constitutional right to assistance of counsel requires reasonably effective assistance of counsel. The court established the well-known two-part test for ineffective assistance of counsel claims: (1) deficient performance by counsel, *i.e.*, performance that falls below an objective standard of reasonableness, and (2) the deficient performance caused defendant actual prejudice. 466 U.S. at 686-88.

To provide constitutionally effective assistance, counsel must investigate the case. *Id.* at 690-91. Pretrial investigation is a critical stage—in many cases, the most critical stage—of a lawyer's preparation. *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984). Counsel's acts are entitled to deference only when they are in fact the result of some informed strategy. Counsel is ineffective when counsel fails to discover essential evidence due to inadequate investigation.

The Tenth Circuit has granted habeas relief based on an attorney's constitutionally ineffective failure to adequately investigate. In *Medina v. Barnes*, 71 F.3d 363, 369 (10th Cir. 1995), a key prosecution witness and the only eyewitness to testify identified the defendant as the person who shot the victim. The eyewitness testified he did not know the victim before that night. The defense counsel appeared to recognize this vulnerability in the state's case, as she featured it in her opening statement.

During habeas proceedings, the defendant showed that defense counsel's investigation was inadequate. For instance, assertions by an assistant district attorney and an FBI agent that the

eyewitness had an extensive criminal history, and shared prison time with the victim, remained unexplored. The court found the defendant's allegations of deficient performance based on counsel's failure to allegedly investigate or discover this information sufficed to warrant an evidentiary hearing on counsel's deficient performance. *Id.*at 367-68. The court also found prejudice resulted based on the importance of the eyewitness's testimony, the facts alleged to exist would have undermined the eyewitness's credibility, and the jury indicated it may deadlock during deliberations. *Id.* at 368-69. The discovery practice, pretrial investigation, or database searches that would be been required to potentially exonerate Lorance are much less time-consuming that the type of investigation that should have occurred in *Medina*.

Other cases have reiterated the importance of pretrial investigation and granted habeas relief when counsel failed to engage in sufficient preparation and that deficient performance prejudiced the defense. *E.g.*, *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) (finding prejudicial deficient performance by defense counsel who failed to call an eye witness who saw another man feeling from the scene); *United States v. Gray*, 878 F.2d 702 (3rd Cir. 1989) (finding prejudicial deficient performance by defense counsel who failed to reasonably investigate by seeking out potential eye witnesses when police reports indicated multiple people at the bar and in the immediate area witnessed the events); *see also Balkcom*, 725 F.2d at 615-19 (granting habeas relief where defense counsel failed to investigate, interview witnesses, prepare a defense, request discovery, visit the crime scene, or otherwise prepare for trial).

In *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court concluded counsel provided constitutionally deficient assistance when he failed to conduct discovery based on the mistaken belief that the prosecution had an obligation to turn over inculpatory evidence. There, counsel did not learn he had grounds for a potential suppression motion until the beginning of trial.

Counsel's motion during trial was untimely because it failed to comply with court rules regarding the time for filing suppression motions absent good cause. Counsel could not show such cause because he never asked for any discovery. Had he obtained such discovery, defense counsel would have known of the warrantless search and seizure prior to trial and been able to timely file a motion to suppress. The court was unmoved by counsel's mistaken belief that the State had to inform him of the case against his client—including inculpatory evidence—absent a request for discovery. *Id.* at 368-69, 385. The Supreme Court concluded counsel's performance was unreasonable. *See id.* at 385.

Likewise, a habeas petition was granted where defense counsel was aware of police reports where witnesses made comments favorable to the accused, as the names and addresses of the witnesses were available to defense counsel, yet he made no effort to locate or interview them. *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987). The Seventh Circuit acknowledged the "heavy measure of deference" accorded counsel's judgments. *Id.* at 1391. Nonetheless, counsel's performance was deficient here where counsel's efforts to interview the witnesses "were perfunctory at best." *Id.* at 1391. The Seventh Circuit emphasized the importance of the potential witnesses to the case given his other possible defense was a weak alibi defense.

Where the defendant was accused of murder, "it was not reasonable for defense counsel to permit his client to stand trial for murder without a more thorough investigation of the available evidence." *Id.* at 1392. The Seventh Circuit affirmed the district court's conclusion the deficient performance prejudiced the defendant. In doing so, the Seventh Circuit noted the district judge observed the witnesses at an evidentiary hearing before weighing the competed testimony and concluding defendant suffered prejudice. *Id.* at 1392-93.

36

In short, courts, including the Tenth Circuit, have found deficient performance when counsel fails to adequately investigate evidence potentially relevant to defenses or mitigation. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003) (defense counsel's limited investigation of mitigating evidence violated petitioner's right to effective counsel during sentencing); *Williams v. Taylor*, 529 U.S. 362 (2000) (counsel did not begin to prepare for the sentencing phase until a week before the trial and failed to uncover mitigating records); *Hooks v. Workman*, 689 F.3d 1148, 1203-07 & n.31 (10th Cir. 2012) (counsel presented woefully inadequate mitigation); *Anderson v. Sirmons*, 476 F.3d 1131, 1142-48 (10th Cir. 2007) (counsel's failure to investigate and obtain readily available evidence in mitigation); *Cargle v. Mullin*, 317 F.3d 1196, 1211 (10th Cr. 2003) (counsel failed to interview or call witnesses, agreed to forego impeachment of immunized co-perpetrator); *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) (counsel ineffective for failing to conduct pretrial investigation and failing to advance defense theory at trial).

### B. The defense team's performance was so deficient and prejudicial to Lorance's defense that it deprived him of a fair trial.

The Commandant adopts the Army Court's recitation of actions that counsel admittedly did to prepare for trial. (Resp. Br. at 22). That counsel prepared some, however, does not mean their performance was constitutionally effective within the meaning of *Strickland* and its progeny. The Lorance defense team did not take sufficient actions reasonably calculated to prepare themselves for the complex issues presented in this fully contested double murder and attempted murder jury trial where Lorance stood to spend the rest of his life in prison. Exp. Mtn. Ex. 16, Declaration of Attorney Guy John Taylor ("Taylor Decl."), ¶¶ 5 - 31).

In particular, counsels' performance was deficient in the following regards:

        o   Counsel failed to compel production of the biometric evidence and all

versions of the SIGACT (updates 1 – 9 and any versions subsequent to 9). As described in detail above, this evidence could have been used (1) to support Lorance's position that his combat orders were reasonable or lawful, (2) to support other defenses discussed above, and (3) in mitigation at sentencing.

o   Counsel failed to interview witnesses whose sworn statements to army investigators indicated that the Afghan National Army, who was "in the lead" of Lorance's Platoon on the morning in question, fired first at the three riders on the single red motorcycle. Nor did counsel attempt to interview any members of the ANA in the lead that day. This information could have been used to support Lorance's position that his combat orders were reasonable and lawful by showing the ANA also perceived the threat posed by the three riders on the motorcycle, or alternatively to support Lorance's defense or mitigation at trial. The information could also have been used to support an alternative causation defense, that is, that the ANA killed and attempted to kill the riders. *See* Statements of Specialist Reyler Leon and Private Zachary Thomas, Exp. Mtn. Exs. 17 and 18 (Afghan National Army fired first at the motorcycle).

o   Counsel failed to interview the previous Platoon Leader, First Lieutenant Dominic Latino, who was medically evacuated from the field after sustaining peppering shrapnel wounds to the face, eyes, and abdomen, to determine why his sworn statement that he would never let a motorcycle get near his Platoon given the deadly threat was later lined out. Alternatively, in light of counsel's concern of tipping his hand to the government, counsel should have called Latino to authenticate his statement and put it before the panel so they could

see with their own eyes the phrase noticeably lined out. Additionally, Latino's testimony that he would never let a motorcycle near his element could have been developed as powerful evidence proving Lorance's combat decision was reasonable and consistent with Army training.

o   Counsel unreasonably failed to interview paratroopers who had been involved in a second firefight with Afghan "civilians" that occurred just moments and meters away from the engagement that resulted in Lorance's conviction for murder and attempted murder. Staff Sergeant Michael A. Herrmann, Specialist Dallas L. Haggard, and Private First Class Nicholas Carson fired their weapons at local nationals, killing two and wounding a third moments and meters away from the motorcycle engagement. Unlike Lorance, these paratroopers were not sent to court-martial for double murder and attempted murder. Such evidence would have degraded the legitimacy of the prosecution's case, and reinforced in the eyes of the jury that Lorance was the Army's "fall guy" for political pressure imposed by the recent deaths of Afghans. When viewed within the context of Gustafson's testimony that "[b]y design, [the Army] distanced themselves from Lorance, cut him loose, turned their backs, and started the narrative that he was "off the rails," bloodthirsty, and a "bad apple" bent on indiscriminate murder, in order to protect their careers," Gustafson Decl. ¶ 41, counsel could have provided the jury with compelling information that Lorance's orders were reasonable in combat and thus lawful. Because counsel chose not to interview these witnesses and develop their testimony, Lorance was denied effective assistance before the

jury.

o   Counsel opted not to question the witnesses regarding their grants of immunity and orders to cooperate in the prosecution's case against Lorance based on his misperception that such grants are later used by the prosecution to bolster witness credibility. But here, it was vitally important to introduce this information to show the witnesses' self-interest in cooperating with the government as they were falsely accused of murder, treated as "suspects," and had potential charges hung over their heads for months. It also could have been used to emphasize the importance of any concessions obtained from these cooperating witnesses on cross-examination, such as when Skelton testified to the nature of the threat he perceived posed by the three riders and that he fired ROE compliant shots. Further, the jury surely wanted to know why paratroopers were testifying against their platoon leader. Exp. Mtn. Ex. 19 (grants of immunity and orders to cooperate in the case against Lorance).

o   Counsel failed to investigate other potential witnesses. He interviewed no Afghan eyewitness nor the attempted murder victim, while the Army investigators did. In his sworn affidavit, lead defense counsel noted that not interviewing witnesses is, in his experience, a "superior defense tactic." Exp. Mtn. Ex. 20.

o   Had counsel engaged in sufficient pretrial investigation, they would have discovered at least two additional defense witnesses and compelling defense evidence: Kevin Huber and Command Sergeant Major Gustafson.

o   Huber is an aerostat operator. Huber reached out to Guy Womack with

information he believed supported the defense. Womack did not follow up. Had he done so, he would have learned that Huber observed three "fighting aged males" armed with AK-47 assault rifles and ICOM radios "shadowing" Lorance's Platoon for a potential attack or coordinated ambush before the motorcycle was engaged and before the Platoon shot and killed two others and wounded RAHIM in the arm. Huber filed a report of his observations and captured video footage on July 2, 2012. Exp. Mtn. Ex. 5, Huber Decl.¶ 12). Counsel could have sought Huber's report and any other materials he recorded, including video captured, in discovery had counsel known it existed. Huber also recalled that Afghan President Hamid Karzai visited Zharay District in the weeks preceding Lorance's combat patrol to protest the killing of a father and his son by another American, forming a potential explanation for why the prosecution sought to bring murder charges against Lorance. *Id.* ¶¶ 19-21.

o   Gustafson was then the senior non-commissioned officer in the Battalion. Gustafson is familiar with the facts and circumstances of the patrol that gave rise to this case, not from the legal actions, but from what he personally observed before, during, and after the combat patrol as a career professional soldier. He would have testified that Lorance's platoon was being scouted for an impending attack or ambush during this combat patrol in a very hot combat zone based on his first-hand understanding of the conditions on the ground, beginning with knowledge of the enemy's tactics, techniques, and procedures (TTPs), and the circumstances surrounding the events of July 2, 2012. Gustafson could further have been

used to impeach any of Skelton's testimony that was inconsistent with Skelton's statement that his shots were ROE compliant based on Gustafson's experience and knowledge of soldiers and their training, including training to not follow an order the soldier believes to be unlawful.

o   Presented and argued facts and law concerning the reasonableness of Lorance's combat orders in light of prevailing Supreme Court standards and relevant case law concerning objective reasonableness, to include the fact that Lorance's subjective intent might have been irrelevant in light of the fact that the decedents were, in fact, enemy combatants, per *Graham v. O'Connor* (Federal officer during deadly force encounter need not be right, only reasonable).

o   Counsel unreasonably failed to develop the defense that even if, as the prosecution urged the jury, those killed were civilians, Lorance was not guilty of murder under the international law of armed conflict, which holds that civilian deaths in combat, although regrettable, are not murder but "collateral damage." *See, e.g.*, *Operational Law Handbook*, US Army Judge Advocate General's Legal Center and School, 17th Edition (2017) at 12, defining ("Collateral damage, also called incidental damage, consists of both unavoidable and unintentional damage to civilian personnel and property incurred while attacking a military objective. **Incidental damage is *not* a violation of international law.")** **(emphasis in original).**

Any one of these deficiencies could suffice to establish prejudice for the reasons described above. Take them altogether, and it is clear Lorance was deprived of effective assistance of counsel and his case prejudiced as a result.

> **C.  The Army Court did not fully or fairly review Lorance's claim of ineffective assistance when it claimed evidence against Lorance was overwhelming while ignoring that the evidence his counsel failed to discover would have provided various bases for acquittal.**

In disposing of Lorance's claims of ineffective assistance of counsel, the Army Court relied on cases indicating any ineffective assistance of counsel claim must consider the efforts of both Lorance's civilian and military defense counsel. The Army Court reliance on such cases was inapt, as the Army Court pointed to no efforts military defense counsel took to address the deficiencies outlined above. 2017 WL 2819756, at *5-7 & n.3.

Even considering counsel's efforts does not change the deficient performance analysis, nor the analysis such performance prejudiced Lorance's defense in this case. For instance, *no* attorney moved to compel nor obtained the exonerating or mitigating fingerprint and DNA evidence. No attorney interviewed any Afghan witnesses (attempted murder victim and two material eyewitnesses), Latino, secured the SIGACT, spoke with Huber, Gustafson, or any CID Agents. No attorney developed the testimony of Leon and Thomas that the Afghan National Army fired first to develop an alternative causation defense or to show that Skelton and Lorance's threat perception were reasonable and thus lawful.

Contrary to the Army Court's conclusion, the fact that Lorance was included in his counsel's strategy decisions does not save the decisions themselves from attack. Strategy decisions made in the dark—without proper investigation to support them—warrant no deference. Effective assistance of counsel requires counsel investigate the case. *Strickland*, 466 U.S. at 690-91. The

Army Court again displayed its buy into the official narrative where it discussed that the evidence against Lorance was "overwhelming" while avoiding that his defense counsel neglected to obtain available evidence showing that: (1) his apprehension that the motorcycle riders posed an imminent threat (ROE compliance) was not only reasonable but also correct; and (2) the killings were legally justified pursuant to RCM 916(c).

The Army Court's opinion omitted any discussion of Skelton's testimony that his shots were ROE-compliant. Nor did the Army Court address Skelton's testimony that he perceived an actual, imminent threat: "[k]nowing the area that it was coming from, the first thought I had was it could be a drive-by shooting; it could be a drive-by grenade throw; it could be a vehicle borne IED." Trial Transcript pg. 537, Exp. Mtn. Exs. 7 - 8.

It failed to account for how the significance of a concession like this could have been highlighted to the panel by calling their attention to the immunities granted and, therefore, how unlikely it was such a witness would provide any information useful to Lorance.

The Army Court looked at the biometric evidence and focused solely on the surviving victim, whose ties to IEDs were confirmed only after "his compatriots were killed" and, therefore concluded that none of the biometric data was helpful. 2017 WL 2819756, at *7. This myopic view carelessly discounted the significance of the evidence. The Army Court's conclusion presumes the survivor left his biometric data on the IED after the June 2, 2012, but there is no basis for reaching this conclusion. The survivor could have been making bombs well before the incident just as easily as he could have been making them after the incident, as is often the case in Afghanistan. Moreover, the Army Court's analysis completely ignores that the survivor (the attempted murder victim who left his fingerprints and DNA on IEDs) shared a motorcycle with an enemy combatant with prior ties to bomb making. And they weren't just "compatriots"—they were family.

44

So, while it is theoretically possible that some person could view that part of the biometric evidence, in isolation, as aggravating, it is more reasonably probable that a panel informed of the connections between the decedents, injured, and material witnesses (and their ties to bomb-making) would have viewed this evidence as, at the very least, as mitigating with regard to any sentence that might be imposed. At most, this evidence could have completely exonerated Lorance of any criminal liability.

To summarize, an objective review of the Army Court's opinion reveals that its task and purpose was single-fold: to endorse and place official imprimatur on Lorance's prosecution and convictions. Such a pre-conceived result cannot be deemed to constitute "full and fair consideration" in the eyes of Article III Courts obligated to review objectively constitutional violations.[8] The Army Court's analysis of *Strickland* was both outcome-oriented and unreasonable, giving this Court authority to review defense counsels' deficient performance and reverse Lorance's convictions. Such review and relief under habeas corpus is not only appropriate, but also necessary, to preserve constitutional protections. *See Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011) ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable").

V.   **The Army Court failed to accord full and fair consideration of Lorance's claim that the Military Judge neglected to give necessary and proper defense instructions.**

The Commandant agrees that a military judge has a duty to *sua sponte* instruct on any defense reasonably raised. Answer & Return, 25. The Commandant sets out the various defenses then takes the position, with no further explanation, that the instructions were not warranted under

---

[8] The Judge who authored the Army Court opinion, had not deployed to combat and retired directly after having issued the opinion.

the facts of the case. Answer & Return, 25-27. The Commandant's conclusory statement does not overcome the law and facts set forth in Lorance's petition.

The argument the Commandant actually develops is that the claimed defenses merged into self-defense or defense of others in this case. Answer & Return, 27-29. However, her perfunctory statement is not correct because the defenses do not merge, rather, are distinct. R.C.M. 916(c) states that "[a] death, injury, or other act caused or done in the proper performance of a legal duty is justified and not unlawful." As Platoon Leader, Lorance had duties imposed on him that went beyond the authorization to defend himself and others. Neither of the defense instructions substantially covered his affirmative duty to act like a justification instruction would have. Accordingly, the Commandant's argument fails and Lorance was deprived of due process.

Then, the Commandant apparently agrees that a mistake of fact about the reasonable apprehension of harm is part of self-defense. Answer & Return, 28. But she argues there was no need to give an instruction on mistake of fact because this legal proposition was already "substantially covered" by the self-defense instruction. While the Commandant correctly states the law, the Commandant apparently did not review the self-defense and defense of other instructions given in this case. Had she done so, she would see that they include <u>no discussion</u> of the effect of a mistake on the defenses of self-defense or defense of others. (Tr., 840-42 [self-defense]; 842-44 [defense of others]). Thus, while a lawyer might know a mistaken apprehension does not negate the defense, the panel did not—*because they were not so instructed*, again depriving Lorance of due process.

Not including a mistake instruction was a particularly significant error. The Army emphasized the narrative that the victims were innocent civilians. But our armed forces in Afghanistan constantly encounter hostile forces that look the same as civilians. Motorcycles are a

known potential threat in these circumstances. The testimony established that. Trial Transcript, pgs. 775-78, Exp. Mtn. Ex. 21 And, sadly, experience confirms that ignoring the threat of a rapidly approaching motorcycle can have deadly consequences. *See, e.g.* Mashal and Rosenberg, *6 American Soldiers Killed in Taliban Attack in Afghanistan*, New York Times (Dec. 21, 2015), *available at* https://www.nytimes.com/2015/12/22/world/asia/bagram-afghanistan-suicide-attack.html (last viewed Aug. 20, 2019). Under such circumstances, mistakes are bound to be made. A mistake instruction, which would have allowed the panel to acquit upon finding Lorance mistakenly perceived a civilian for a hostile, could have turned the tide.

VI.    **Declining to address the issue, the Army Court did not provide full and fair review of the question of whether an order to fire at targets charging a platoon marching single file through a minefield in a combat zone can legally constitute murder or attempted murder.**

Before the Army Court, Lorance asked a pivotal question—a point that reasonably stood to require a complete reversal and disapproval of the findings and the sentence: Can an order to fire at targets charging a platoon in a combat zone which killed enemy combatants be double murder or attempted murder? The Commandant's response evinces a misunderstanding of Lorance's argument.

First, the Commandant asserts that Lorance's argument hinges on whether Lorance knew that the targets were enemy combatant terrorist bombmakers. It does not. See discussion of RCM 916(c) *supra*. Lorance's argument turns on whether his conduct in a combat zone could properly be construed as criminal. Bear in mind what Lorance did know: three men were riding tandem on a motorcycle through a minefield, approaching from Chilliwack Road, a road known as a staging point for attacks against US personnel, and approaching his platoon at a high speed. Trial Transcript, pgs. 775-78, 785, Exp. Mtn. Ex. 21. Lorance's platoon had suffered multiple casualties

47

doing this exact type of work before on the same battlefield and faced a real, immediate risk of more. Skelton perceived an imminent threat. Trial Transcript, pgs. 537; 585-86, Exp. Mtn. Ex 21. Lorance was the platoon leader, responsible and accountable for the safety of his paratroopers. Confronted with these circumstances in a combat zone, did the law require Lorance to wait for the motorcyclists to open fire, toss a grenade, or trigger a buried IED before his orders would be justified? The obvious answer is a resounding "no!" Decisions to prosecute based on political whims to appease a host nation will risk American lives. And if the military courts will not call a halt to such counterproductive practice, that task falls upon the Article III Courts.

The Commandant goes on to cite a portion from the Army Court opinion about the SROE. Answer & Response, 30. Tellingly, though, that portion of the opinion contains no citation to the law of murder, attempt, justifications, or defenses. *See* 2017 WL 28119756, at *1. Stating that the sole issue is whether Lorance followed the ROE or SROE ignores that applicable law. Causing death is not unlawful where it was justified or excused, especially in combat where under the international law of armed conflict, briefed to the Army Court but ignored, civilians killed in combat are not murdered, rather, "collateral damage" from the "fog of war." The Commandant repeats the Army Court's error and analysis here rather than engaging in the discussion of justification or excuse.

What's more, the Commandant ignores that fact that Lorance was found not guilty of changing the ROE. Even now on habeas review, the Commandant sticks to the party line and maintains the Army's official narrative that Lorance, the "bad apple," "falsely briefed his platoon that anyone riding a motorcycle was to be engaged." Answer & Return, 31. The Army's entire case was built on this premise, but it was ultimately unable to prove it.

Once the panel found Lorance not guilty of that charge, and thereby rejected that premise, the remainder of the case became structurally unsound. The foundation removed, the entire edifice built upon it must collapse. *Fiore v. White*, 531 U.S. 225, 228-29 (2001) (reversing for insufficient evidence a conviction based on failing to have a permit when undisputed evidence was the defendant had the requisite permit).

There is insufficient evidence to support the panel's findings on murder and attempted murder even when viewed in the light most favorable to the government. *See Fiore v. White*, 531 U.S. 225, 229 (2001); *see also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). And a conviction without sufficient evidence violates the federal Due Process Clause. *Fiore*, 531 U.S. at 226.

## VII.    **Prosecutorial misconduct claims were exhausted or should be considered because certain facts supporting the claim only occurred after the Army Court's decision.**

The Commandant takes the position Lorance's prosecutorial misconduct claims are not reviewable because they were not exhausted before the military court. Answer & Return, 15-17. The Commandant concedes that Lorance exhausted any prosecutorial misconduct based on his *Brady* and related RCM violations by raising them to the Army Court; thus it appears her exhaustion argument applies only to other aspects of Lorance's prosecutorial misconduct claim. *See* Answer and Return, 16 ("[P]etitioner never submitted a discrete claim of prosecutorial misconduct to the military courts for consideration outside the umbrella argument that the government ran afoul of its requirements under *Brady* and R.C.M. 701(a)(6).").

Turning to the remaining facts supporting Lorance's prosecutorial misconduct claims, Lorance consistently addressed them in arguing his case to the Army Court. E.g., Doc. 13-8 (Lorance's Army Court Briefing), 17 (charges threatened against 9, immunity offered and testimony ordered, Charge Sheet lined out by prosecutor, exonerating and mitigating evidence

49

suppressed). But he had no basis for believing them to be prosecutorial misconduct before the Army's official narrative was publicly repeated, video recorded, disseminated on the internet, with false statements knowingly left uncorrected before the public and at least one Member of the Congress.

It was not until 2018 that Brigadier General Joseph B. Berger III publicly placed Lorance's combat orders to fire at three men of military-age riding a motorcycle rapidly through a minefield on par with Calley and the slaughter of unarmed women, children, and elderly in My Lai—while Lorance's case was pending review by the Secretary of the Army. Not until 2018 did the Chief Judge of the Army Court publicly and errantly accuse Lorance of unilaterally changing the ROE although he had been acquitted of the charge, and then refuse to correct it when asked. Therefore, there was no opportunity to present this aspect of misconduct to the Army Court before it issued its opinion in 2017.

Further, the systemic efforts to quell Lorance's attempts to secure some relief (such as Pede's efforts to dissuade Congressman Graves from supporting Lorance's pardon efforts by repeating the official narrative the Army had failed to prove), only became known to Lorance after the Army Court issued its opinion. It was only after learning the official line and the Army's dedication to seeing it through that Lorance had reason to believe that other aspects of the prosecutor's actions constituted knowing and willful misconduct to include apparent false official statements (criminal offenses under Article 107, UCMJ, to which Berger and Pede are subject).

The Commandant cites *Roberts v. Callahan*, 321 F.3d 994 (10th Cir. 2003), to support her argument that Lorance's prosecutorial misconduct claim was unexhausted and thus procedurally barred from review now. But *Roberts* acknowledged an exception to the waiver rule, relying on *Lips. See* 321 F.3d at 995. In *Lips*, the Tenth Circuit extended an exception that allows a claim to

be raised for the first time on habeas review when the petitioner shows "cause excusing the procedural default and actual prejudice resulting from the error." *Lips*, 997 F.2d at 812.

Lorance's lack of access to the information that ultimately revealed the coordinated prosecutorial misconduct is sufficient cause to excuse him from not raising issues that were not known until after the Army Court's decision. Thus, he is not procedurally barred from raising his claim of misconduct now. For the reasons stated in Lorance's habeas petition, the prosecution engaged in misconduct that warrants this court grant habeas relief. (Doc. 1, at 4-5, 62-65).

## CONCLUSION

Lorance was denied the process and constitutional protections he was entitled to receive. Due to the actions, and inactions, of counsel on both sides of the courtroom, as well as the military judge's instructional errors, Lorance was denied a fair trial and received substantially less than full and fair review on appeal. Now in possession of startling information unavailable to him before, it seems apparent that Lorance's claims could not receive due consideration before any Article I military tribunal.

Lorance respectfully requests that this Court grant his motion to expand the record filed contemporaneously with this Traverse under Habeas Rule 7.

Before the court are numerous and substantial constitutional grounds on which to disapprove the findings and sentence pursuant to 28 U.S.C. § 2243 and free Lorance from continued unlawful incarceration by Federal officials (the Court is authorized to grant relief as law and justice require).

Alternatively, Lorance respectfully requests that the Court receive his motion for specific discovery to be made pursuant to Habeas Rule 7 and schedule an evidentiary hearing to allow Lorance an opportunity to present evidence further demonstrating why his primary convictions are

51

unconstitutional, legally unsound, and should be reversed and disapproved. Though the civilian courts' habeas review is understandably limited, this is a case where it is not only appropriate, but necessary, for the Article III Courts to step in to ensure there is public confidence in the fact that those who take up arms in defense of our nation, at great risk to themselves, do not shed the constitutional protections provided to them.

Respectfully submitted,


By: /s/ Christopher M. Joseph
*Attorneys for Petitioner*

John N. Maher *pro hac vice*  
Kevin J. Mikolashek  
David Bolgiano  
Don Brown  
MAHER LEGAL SERVICES PC  
26 South 3rd Street, Number 68  
Geneva, Illinois 60134  
Tel: (708) 468-8155  
john@maherlegalservices.com

Christopher Joseph, #19778  
Carrie Parker, #24988  
Diane Bellquist, #20969  
JOSEPH, HOLLANDER & CRAFT LLC  
1508 SW Topeka Blvd.  
Topeka, KS 66612-1887  
(785) 234-3272 Main  
(785) 234-3610 Fax  
cjoseph@josephhollander.com

CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

By: /s/ Christopher M. Joseph
Christopher M. Joseph, #19778
