UNITED STATES DISTRICT COURT
— District of Kansas —
(Kansas City Docket)

CLINT A. LORANCE,

    Petitioner,

v.                                                      CASE NO. 18-cv-3297-JWL

DAWN HILTON,
Colonel, United States Army,
Commandant, United States
Disciplinary Barracks,
Ft. Leavenworth, Kansas,

    Respondent.

RESPONDENT'S RESPONSE TO PETITIONER'S
MOTION FOR DISCOVERY
(Doc. 23)

    APPEARS NOW Jared S. Maag, Assistant United States Attorney, on behalf of the Respondent in the above-entitled action, and submits the following response to petitioner's motion for discovery. (Doc 23, Mot. for Discovery at 1-11.)

    Petitioner moves this Court for an Order under Rule 6(a) of the Rules Governing § 2254 Cases requiring the government to provide him with a

multitude of documents, admissions, and depositions to support his claims that the United States Army committed "profound *Brady* violations" as well as misconduct and that defense counsel was ineffective throughout the proceedings below. (*Id.* at 3.)[1]  For the following reasons, petitioner's motion must be rejected.

I.   Rule 6(a) and Required Showing

It is well-understood that a habeas petitioner has no right to automatic discovery. *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001); *Newton v. Kemna*, 354 F.3d 776, 783 (8th Cir. 2004) (habeas petitioners, unlike the usual civil litigants, are not entitled to discovery as a matter of ordinary course). However, Rule 6(a) provides that a habeas petitioner is entitled to discovery "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."  To that end, the Supreme Court of the United States has established a general approach on whether a petitioner has established "good cause" warranting discovery under Rule 6(a), holding that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to

---

[1] Rule 6(a) of the Rules Governing § 2254 Cases states in full that "[a] party shall be entitled to invoke processes of discovery available under Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

2

demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 2300 (1969)); *In re Robinson*, 917 F.3d 856, 865 (5th Cir. 2019) (same); *Bowers v. U.S. Parole Com'n, Warden*, 760 F.3d 1177 (11th Cir. 2014) (Section 2241 parole denial claim filed by federal prison inmate; holding same that habeas petitioners are not entitled to discovery as a matter of ordinary course; it is within the discretion of the district court to grant discovery upon a showing of good cause; good cause is demonstrated where specific allegations show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief).

Finally, once petitioner has demonstrated good cause, he may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, to include the use of interrogatories, depositions, document requests, and requests for tangible evidence.   *Payne v. Bell*, 89 F.Supp.2d 967, 970 (W.D. Tenn. 2000); *Copeland v. Ryan*, 852 F.3d 900, 906-07 (9th Cir. 2017) (Section 2254 discovery requests are conducted under the Rules of Civil Procedure, as further described by advisory committee notes to Rules Governing Section 2254 cases).

II.     ARGUMENT

In his motion, petitioner seeks an Order demanding the government produce a sizeable amount of information which he maintains will assist him in developing various *Brady* violation allegations as well as completely unfounded allegations of misconduct directed at all levels of the government's team of prosecutors, investigators, and reviewing officials.  He submits that his claims are even more compelling than those claims set forth in *Bracy*.  (Doc. 23, Pet. Mot. for Discovery at 3.)  However, petitioner fails to appreciate the glaring differences that exist between his situation and *Bracy*, namely, that the Army Court of Criminal Appeals—unlike the lower court in *Bracy*—engaged in a thorough analysis of petitioner's *Brady* allegations and rejected his arguments. *United States v. Lorance*, ARMY 20130679, 2017 WL 2819756, at *3-5 (Army Ct.Crim.App. 27 June 2017) (unpub.).  Additionally, the facts in *Bracy* were clear on their face, as opposed to the situation here where petitioner advances a factual scenario without foundation and seeks approval from this Court to broaden discovery to sustain his unfounded assertions.  Petitioner now seeks a second bite at the apple in an effort to re-litigate issues that he failed to prevail on below.  His request also runs counter to the very strict review standard that this Court must operate by, and petitioner's motion cannot be sanctioned as a

means to under-cut that procedure.

Putting a critical eye on petitioner's requests exposes that the items he seeks cannot lend support to any claim (colorable or otherwise) which would demonstrate an entitlement to relief.  To drive the point home, the government feels compelled to once again remind this Court—because petitioner simply will not address the matter—that his *entire* claim of innocence balances against the irrefutable facts (1) that petitioner was *not in imminent danger* from the Afghan men that he ordered his platoon to fire on given that the Afghan men had not engaged in a hostile act or demonstrated imminent hostile intent; (2) that the Afghan men were not lawful combatants under the Laws of Armed Conflict at the moment petitioner ordered his men to fire, i.e., "[t]here were no declared hostile forces, and thus no authority to engage any person upon sight," *Lorance*, ARMY 20130679, 2017 WL 2819756, at *3; and (3) that petitioner was *completely unaware* at the moment he ordered his platoon to fire on the unarmed Afghan men that any one of the three victims had been identified as having placed markers on suspected IEDs.[2]  Thus, the Court's analysis of petitioner's

---

[2] If petitioner had been aware that the Afghan men were suspected of handling IEDs, this knowledge still would not have authorized him to order his men to fire given that the three Afghan men remained unarmed and were not posing any danger at the time the members of the platoon began to fire.  Nevertheless, Respondent finds it troubling that petitioner remains adamant about the biometric material when he himself obstructed a properly conducted Battle Damage Assessment (BDA) – which is meant to secure biometric data – by preventing the

entire request must be filtered through this particular lens.

Addressing petitioner's specific requests, Respondent provides the

---

qualified, trained, and equipped soldier from performing his task; and, instead, ordering two unqualified and insufficiently equipped soldiers to perform the BDA, ultimately demanding that the villagers take the bodies of the Afghan men after a very cursory inspection was done by the PFCs. In other words, Respondent is puzzled that petitioner complains about the Army purposefully hiding biometric data when he actively took steps to prevent a proper BDA, instead making the unilateral decision to actively lie about how the BDA was conducted. This fact was noted by the Army Court of Criminal Appeals in the following passage:

> [Petitioner] ordered two soldiers, PFC Wingo and PFC Leon, to conduct a Battle Damage Assessment (BDA) of the deceased victims. BDAs normally entailed taking photographs, obtaining biometric data, and testing for any explosive residue on the bodies. Private First Class Skelton was the soldier trained and equipped to conduct a BDA and was also responsible for briefing the TOC afterwards. Even though PFC Skelton was standing right next to [petitioner], [petitioner] had PFC Wingo and PFC Leon conduct the BDA, neither of whom had the training or equipment to properly perform the task. When PFC Skelton reminded [petitioner] that he was supposed to do the BDA, [petitioner] told PFC Skelton not to because he wouldn't like what he saw.
>
> After the two soldiers conducted a cursory inspection of the victims, [petitioner] told the gathered villagers to take the bodies. The soldiers did not find any weapons, explosives or communications gear on the bodies. [Petitioner] then told the radio transmission operator (RTO) to report over the radio that a BDA could not be done because the bodies were removed before the platoon could get to them. When the RTO did not make this report, [petitioner] took over the radio and made this report to Captain (CPT) Swanson, the Troop Commander.
>
> After the mission, and back at Strong Point Payenzai, [petitioner] told PFC Skelton not to include the BDA information in his upcoming brief to the TOC. Private First Class Skelton went to the TOC at Strong Point Ghariban to deliver his intelligence brief on the patrol. Upon arriving, he informed the COIST platoon leader that he needed to speak with CPT Swanson. PFC Skelton told CPT Swanson what happened on the patrol and that he believed they may have civilian casualties. Shortly thereafter, [petitioner] was relieved of his duties pending an investigation into the events.

*Lorance*, ARMY 20130679, 2017 WL 2819756, at *2-3 (emphasis supplied).

following:

    A.    <u>Document Production</u>

(1) The request for aerostat operations material provides no relevant support to petitioner's claim of innocence. It is extraneous to what petitioner knew at the time he ordered his platoon to fire and is immaterial to the facts of this case.

(2) The request for all CID reports is conclusory and lacks any foundation as to relevancy and materiality. Additionally, petitioner does not specify what reports were "previously denied" and under what circumstances they were "denied." Finally, petitioner fails to report in his requests that the Army Court of Criminal Appeals noted that "[t]here is nothing in the record that supports any inference that the defense was unsatisfied with the government's response to its discovery requests, such as the motion to compel." *Lorance* at *11.

(3) The request for Army and State Department communications is wholly irrelevant to the underlying facts of this case, is speculative, and is designed solely to bolster the narrative that petitioner hopes this Court will adopt.

(4) The request for the Wolfhound (ICOMS) intercept was fully explored at trial during the testimony of Sergeant First Class Ayers. (Vol. VI,

Trial Tr. at 486-517.)  As Ayers testified, the chatter was "a separate location in time entirely."  (*Id.* at 514.)  It would therefore not assist petitioner in demonstrating that he is entitled to relief, nor assist the Court in resolving the issues before it.

(5) The request for significant activity reports on an unrelated matter has no bearing on the events for which petitioner was convicted.

(6)  The request for medical records of Mohammad Rahim is also irrelevant to the issue of whether petitioner was culpable for ordering his platoon to fire on three unarmed Afghans.

(7)  The request for additional significant activity reports is irrelevant unless petitioner can establish that these reports played a direct role in his decision-making process when he ordered his platoon to fire.  In other words, unless these reports were read by petitioner in advance of the mission, the reports only serve to prop up petitioner's tenuous narrative.  Moreover, petitioner's request is the classic example of an attempt to fish for information simply by baldly alleging that these documents must contain exculpatory information by their mere existence.  This is improper.  *Black v. Workman*, 2010 WL 565285 at *45 (W.D. Okla. Feb. 10, 2010) (unpub) ("'A habeas proceeding is not a fishing expedition.' *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir.2007).  Where a

request for discovery is 'generalized and does not indicate exactly what information [a petitioner] seeks to obtain[,]' it does not meet the specificity requirements of Rule 6. *Id. See also Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir.2000) (noting that Rule 6 is not meant for fishing expeditions and that 'factual allegations must be specific, as opposed to merely speculative or conclusory'").

(8)   The request for documents of any administrative separation of one or more CID agents is simply too broad for consideration.  Agent Mitchell testified that he was "chaptered" out of the Army for "leadership failures unrelated to investigations."  (Vol. IV, Trial Tr. at 31.)   Petitioner appears to suggest that other agents must have likewise been removed or had disciplinary action taken against them, thus the reason for the expansive discovery request. This type of request would have been covered in the original discovery orders related to the trial of this matter and there is nothing to demonstrate that the government ran afoul of its obligations to discover all relevant *Giglio* material related to the investigating officers.   Consequently, this particular request must be denied.

(9)   The request for documents related to "any and all engagements involving a motorcycle during the 4-73's 2012 deployment to Afghanistan" is far

9

too burdensome and similarly irrelevant unless petitioner can demonstrate his knowledge of the information in these specific documents. Once again, petitioner casts a line to fish for information that he hopes will sustain his thin narrative. His request here must be denied.

B.   Request for Admissions

Respondent will not submit direct answers to petitioner's requests for admissions unless and until this Court determines that such responses are necessary under Rule 6.

However, petitioner's requests—not unlike the requests for documents—are clearly designed to support his narrative that the killing of three unarmed Afghans was proper because each victim was an alleged terrorist bomb-maker (albeit unknown to petitioner at the time) who deserved to be killed anyway, and that his prosecution was riddled with prosecutorial misconduct and political motivations. Accordingly, none of the requests for admissions advances this matter in a relevant direction, and petitioner's requests for admissions should be denied.

C.   Subpoenas

Petitioner had every opportunity to request his own records from his attorney when he was litigating these matters before the military courts and

failed to avail himself of that opportunity.  Had he done so, and his attorney refused, he could have moved the court below to compel disclosure of the documents.  *See, e.g., United States v. Dorman*, 58 M.J. 295, 298 (C.A.A.F. 2003) ("Pursuant to trial defense counsel's continuing obligation to the client and the corresponding duty of confidentiality, we hold that trial defense counsel must, upon request, supply appellate defense counsel with the case file, but only after receiving the client's written release.")

Petitioner's failure to exhaust this remedy below certainly plays a factor in this Court's consideration of the material sought should petitioner succeed in issuing a subpoena under Fed. R. Civ. P. 45, *infra* at n. 3, for the files of his trial counsel.

D. <u>Depositions</u>

Petitioner's requests for depositions, and assertions that sworn declarations are necessary, again divert attention away from the core issue before this Court, namely, whether the military courts gave full and fair consideration to the claims he now presents on collateral appeal.

Petitioner fails to establish, beyond vague, general terms, what he expects the depositions of his former attorneys to reveal.  To that same end, he fails to demonstrate that depositions can reveal information that he was unable to access

previously, was not available to, or considered by, the military courts, or is not readily available to this Court.

Likewise, petitioner offers speculative allegations of prosecutorial misconduct. Captain Otto was obviously available during the trial process, and there is no reason petitioner could not have raised ethical concerns during those proceedings.

Similarly, petitioner offers only a vague and speculative allegation of misconduct based upon Dominic Latino amending his sworn statement. He suggests, again without foundation, that Latino must have been coerced into making the change; yet, he provides no explanation for his failure to explore this particular allegation while Latino was on active duty and available for interview during that time. In any event, Latino's opinion is wholly irrelevant as he was not on the mission where petitioner ordered his men to fire on the Afghans. Thus, any deposition would result in no colorable information that would assist petitioner in his appeal before this Court.

Petitioner's request for a deposition of the Brigade Commander results in the same outcome as Latino and should be rejected for the same reasons.

As to petitioner's request to provide sworn declarations of United States Representative Garrett Graves and his staff member, Respondent submits that

these declarations should be viewed with caution.[3]   Respondent further notes that petitioner's appeal for these specific subpoenas runs far afield of the primary concern before this Court.   Indeed, this particular request highlights his continuing attempt to inject political matters into a collateral appeal that must remain free of outside influence from individuals who had no role in the trial below and have no reason to provide an opinion about a phone call with a military officer that occurred five years after the trial.

Petitioner's motion essentially moves this Court to sanction a new trial. As stated above, the requests he submits are entirely irrelevant given the inescapable fact that he was wholly unaware that the three, unarmed Afghan men, posing absolutely no threat to the platoon at the moment petitioner ordered his men to fire, may or may not have had biometric ties to suspected IEDs.   All of petitioner's requests are motivated by his attempt to direct the narrative away from the obvious and towards one of persecution and political motivation. This Court should not indulge his attempts to drive this appeal in an unnecessary

---

[3] Petitioner's request is controlled by Fed. R. Civ. P. 45, through the lens of Rule 6(a). Accordingly, the government does not take a position about the issuance of the subpoenas to Representative Graves.   The government simply notes that these documents do not meet the good cause standard.   Indeed, if the declarations are accepted by the Court, each must be reviewed with a critical eye as the very subject matter belies good cause under the 6(a) standard.   Thus, in the event the Court sanctions the issuance of the subpoenas, Respondent continues to aver that these declarations are irrelevant to the issues presently before the Court.

direction.

CONCLUSION

Petitioner argues that he has presented this Court with colorable claims under Rule 6 that necessitates an Order requiring the government to provide wide-ranging discovery. Petitioner's claims, however, do nothing but cloud the record with extraneous and irrelevant information designed to simply fit the narrative that he wants this Court to rely on in support of his claim for collateral relief. The military courts decidedly rejected petitioner's allegations of misconduct and defense counsel's ineffectiveness, and this Court should not entertain petitioner's motion to revive these issues through discovery.

WHEREFORE, Respondent respectfully moves this Court to deny petitioner's motion for discovery.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney
District of Kansas

By:   /s/ *Jared S. Maag*

JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
jared.maag@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2019, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Carrie Elizabeth Parker
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
785-234-3272
Fax: 785-234-3610
Email: cparker@josephhollander.com

Christopher Michael Joseph
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
785-234-3272
Fax: 785-234-3610
Email: cjoseph@josephhollander.com

David G. Bolgiano
Maher Legal Services PC
7 East Main Street, Number 1053
St. Charles, IL 60174
410-903-2600
Email: airbornerobocop@yahoo.com

Diane L. Bellquist
Joseph, Hollander & Craft, LLC - Topeka
1508 SW Topeka Blvd.
Topeka, KS 66612
785-234-3272
Email: dbellquist@josephhollander.com

John N. Maher
Maher Legal Services, PC
7 East Main Street, Number 1053
St. Charles, IL 60174
708-468-8155
Email: johnmaher@maherlegalservices.com

By:   /s/ *Jared S. Maag*
JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney