**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**CLINT A. LORANCE,**

      **Petitioner,**

      **v.**             **CASE NO.  18-3297-JWL**

**COMMANDANT,
U. S. DISCIPLINARY BARRACKS,**

      **Respondent.**

## MEMORANDUM AND ORDER

This matter is a petition for habeas corpus filed under 28 U.S.C. § 2241.  Petitioner is

confined at the United States Disciplinary Barracks in Fort Leavenworth, Kansas.  Petitioner

challenges his 2013 conviction by general court-martial.  Because the Petition contains both

exhausted and unexhausted claims, the Court dismisses the mixed petition without prejudice.

## I.  FACTUAL BACKGROUND

In August of 2013, Petitioner was convicted by general court-martial as follows:

> An officer panel sitting as a general court-martial convicted
> [Petitioner], contrary to his pleas, of attempted murder, murder,
> wrongfully communicating a threat, reckless endangerment,
> soliciting a false statement, and obstructing justice in violation of
> Articles 80, 118, and 134 Uniform Code of Military Justice, 10
> U.S.C. §§ 880, 918, 934 (2012) [hereinafter UCMJ].  The panel
> sentenced [Petitioner] to a dismissal, confinement for twenty years,
> and forfeiture of all pay and allowances.  The convening authority
> approved only nineteen years confinement but otherwise approved
> the sentence as adjudged.

*United States v. Lorance*, Army 20130679, 2017 WL 2819756 (A. Ct. Crim. App. June 27,

2017).  The Army Court of Criminal Appeals ("ACCA") summarized the underlying facts as

follows:

In 2012, [Petitioner] and members of 4th Brigade Combat Team (BCT), 82nd Airborne Division were deployed to Afghanistan. During this time, the Chairman of the Joint Chiefs of Staff's Standing Rules of Engagement (SROE) were in effect. The SROE permitted soldiers to use force in defense of themselves or others upon the commission of a hostile act or the demonstration of imminent hostile intent. There were no declared hostile forces, and thus no authority to engage any person upon sight.

In June 2012, First Platoon of the BCT was situated at an outpost named Strong Point Payenzai, located near the village of Sarenzai in the Zharay district of Kandahar province. First Platoon had recently lost their platoon leader to injury from an improvised explosive device (IED), and had suffered other casualties in the months prior. [Petitioner], who had spent the deployment as the squadron liaison officer (LNO) at the brigade tactical operations center (TOC), was assigned to take over as the platoon leader.

On 30 June 2012, [Petitioner], in his new role, was leading the platoon back to Strong Point Payenzai from the Troop TOC at Strong Point Ghariban. As they approached the Entry Control Point (ECP), [Petitioner] encountered an Afghan villager with a young child. The villager was asking to move some concertina wire on the road leading to Strong Point Payenzai that was impeding his ability to work on his farm. [Petitioner] told the villager that if he touched the concertina wire, he and his family would be killed. [Petitioner] conveyed the seriousness of his message by pulling back the charging handle of his weapon and pointing the weapon at the young child. [Petitioner] ended the encounter by instructing the villager to come to his shura, a meeting, and to bring twenty people.

The next day, [Petitioner] ordered two of his soldiers to go up into one of the towers and shoot harassing fire in the general direction of villagers. [Petitioner] told the soldiers he was doing this in order to provoke the villagers' attendance at the upcoming shura. Hearing the shots, the Troop TOC radioed Strong Point Payenzai for a report. [Petitioner] instructed a noncommissioned officer to respond by falsely reporting the Strong Point was receiving fire.

On 2 July 2012, a mission brief was held for the platoon and their accompanying Afghanistan National Army (ANA) element before they left to go on a patrol. In this briefing, it was announced that motorcycles were now authorized to be engaged on sight, although the testimony was somewhat inconsistent with at least one soldier recalling this coming from the ANA while others identified

[Petitioner] as the source of this new information. [Petitioner] had posted a sign in the platoon headquarters prior to the patrol stating that no motorcycles would be permitted in the area of operations. As the platoon, with the ANA element in the lead, moved out they encountered a number of villagers near the ECP complaining about the shots from the day prior. [Petitioner] told the villagers that they could discuss it at the upcoming shura. [Petitioner] told the villagers to leave and then began counting down from five. The platoon began its patrol.

Not long into the patrol, Private First Class (PFC) Skelton, the Company Intelligence Support Team (COIST) member attached to the platoon headquarters element, called out to [Petitioner] that he observed a motorcycle with three passengers. PFC Skelton did not report any hostile actions, but simply that he spotted a motorcycle with three passengers in his field of view. [Petitioner] did not ask whether the motorcycle passengers were presenting any threat. [Petitioner] ordered PFC Skelton to engage the motorcycle. PFC Skelton complied and fired his weapon, but missed. At trial, PFC Skelton testified that he would not have fired upon the motorcycle or its passengers on his own, because "there was no reason to shoot at that moment in time that presented a clear, definitive hostile intent and hostile act."

Apparently in response to the impact of PFC Skelton's rounds, the motorcycle stopped, the male passengers dismounted and began walking in the direction of the ANA unit. The ANA soldiers did not open fire, but rather gesticulated to the men, who then headed back to their motorcycle. As the three men returned to the motorcycle, [Petitioner], over his portable radio, ordered the platoon's gun truck to engage the men. Private E–2 (PV2) Shiloh, the gunner on the 240 machine gun in the gun truck that had overwatch of the patrol, had continuous observation of the victims from after the first set of shots by PFC Skelton. Upon receiving [Petitioner]'s order, Private Shiloh fired his weapon, killing two of the riders and wounding the third. The third victim ran away into the village. Prior to the engagement, the victims had no observable weapons or radios, and were not displaying any hostility toward U.S. or Afghan forces. According to PV2 Shiloh, the only reason he engaged the men was because he was ordered to do so by [Petitioner]. Following the engagement, the two deceased victims were on the ground, and the motorcycle was standing up, kickstand still down. Upon learning that the motorcycle was still standing, [Petitioner] ordered PV2 Shiloh to engage and disable the motorcycle. PV2 Shiloh refused this order, noting that a young boy was nearby.

Shortly after this engagement, helicopter support came on station. The aircraft crew received a request to locate the third motorcycle rider last seen running into the village. While on station, the pilot took aerial photographs of the two deceased victims and the motorcycle. Sergeant First Class (SFC) Ayres, the platoon sergeant, linked up with [Petitioner] to find out what happened, as he had heard the shots moments before. [Petitioner] told SFC Ayres that the aircraft had spotted the men on the motorcycle with weapons before his troops engaged.

[Petitioner] ordered two soldiers, PFC Wingo and PFC Leon, to conduct a Battle Damage Assessment (BDA) of the deceased victims. BDAs normally entailed taking photographs, obtaining biometric data, and testing for any explosive residue on the bodies. Private First Class Skelton was the soldier trained and equipped to conduct a BDA and was also responsible for briefing the TOC afterwards. Even though PFC Skelton was standing right next to [Petitioner], [Petitioner] had PFC Wingo and PFC Leon conduct the BDA, neither of whom had the training or equipment to properly perform the task. When PFC Skelton reminded [Petitioner] that he was supposed to do the BDA, [Petitioner] told PFC Skelton not to because he wouldn't like what he saw.

After the two soldiers conducted a cursory inspection of the victims, [Petitioner] told the gathered villagers to take the bodies. The soldiers did not find any weapons, explosives or communications gear on the bodies. [Petitioner] then told the radio transmission operator (RTO) to report over the radio that a BDA could not be done because the bodies were removed before the platoon could get to them. When the RTO did not make this report, [Petitioner] took over the radio and made this report to Captain (CPT) Swanson, the Troop Commander.

After the mission, and back at Strong Point Payenzai, [Petitioner] told PFC Skelton not to include the BDA information in his upcoming brief to the TOC. Private First Class Skelton went to the TOC at Strong Point Ghariban to deliver his intelligence brief on the patrol. Upon arriving, he informed the COIST platoon leader that he needed to speak with CPT Swanson. PFC Skelton told CPT Swanson what happened on the patrol and that he believed they may have civilian casualties. Shortly thereafter, [Petitioner] was relieved of his duties pending an investigation into the events.

*Id.* at *1–3.

Petitioner filed a Petition for a New Trial and an appeal to the ACCA, asserting six assignments of error:

> I. THIS COURT SHOULD ORDER A NEW TRIAL BASED ON R.C.M. 1210 BECAUSE THE GOVERNMENT SUPPRESSED CRITICAL EVIDENCE OF THE VICTIMS' IDENTITIES AS ENEMY COMBATANTS AFFILIATED WITH IMPROVISED EXPLOSIVE DEVICE NETWORKS AND LINKED TO U.S. CASUALTIES, IN VIOLATION OF THE FIFTH AMENDMENT, *BRADY v. MARYLAND,* R.C.M. 701 (a) (6); R.C.M. 701 (a) (2) (A), and AR 27-26.

> II. THE CONVENING AUTHORITY ABUSED HIS DISCRETION BY FORWARDING THE RECORD OF TRIAL THE SAME DAY HE TOOK INITIAL ACTION, THEREBY PREMATURLY SEVERING JURISDICTION, AND BY DECLINING TO ACT ON APPELLANT'S REQUESTS TO RECALL AND MODIFY THE ACTION IN LIGHT OF NEWLY-DISCOVERED EVIDENCE .

> III. THE MILITARY JUDGE COMMITTED CONSTITUTIONALLY PREJUDICIAL ERROR WHEN SHE FAILED TO *SUA SPONTE* INSTRUCT THE PANEL ON FOUR SPECIAL DEFENSES REASONABLY RAISED BY THE EVIDENCE.

> IV. DEFENSE COUNSEL'S REPRESENTATION OF FIRST LIEUTENANT LORANCE FELL BELOW THE REQUIRED STANDARD OF CARE AND THE PREJUDICE THAT RESULTED CANNOT BE RENDERED HARMLESS.

> V. THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT CONVICTIONS FOR ATTEMPTED UNPREMEDITATED MURDER AND UNPREMEDITATED MURDER.

> VI. THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT A CONVICTION FOR SPECIFICATION 4 OF CHARGE IV (OBSTRUCTING JUSTICE) .

(Doc. 13–8, at 1–2, Brief of Appellant.) Petitioner's Petition for a New Trial was denied, and his conviction and sentence were affirmed. *United States v. Lorance*, Army 20130679, 2017 WL

2819756 (A. Ct. Crim. App. June 27, 2017).

Petitioner filed a Petition for Grant of Review in the U.S. Court of Appeals for the Armed Forces ("CAAF"), raising the following issues:

> I. WHETHER THE ARMY COURT ERRED WHEN IT HELD THAT DUE PROCESS IN A COMBAT MURDER CASE DOES NOT REQUIRE THE PROSECUTION TO SEARCH THE ARMY'S BIOMETRICS DATA TO VERIFY WHETHER LOCAL-NATIONALS SHOT DURING A COMBAT PATROL IN A COMBAT ZONE IN AFGHANISTAN WERE CIVILIANS?
>
> II. WHETHER THE ARMY COURT FAILED TO APPLY ARTICLE 73 AND R.C.M. 1210 WHEN IT DENIED lLT LORANCE'S PETITION FOR A NEW TRIAL TWENTY MONTHS AFTER HAVING GRANTED A MOTION TO EXPEDITE ITS DETERMINATION?
>
> III. WHETHER COUNSEL WAS INEFFECTIVE WHEN THEY NEITHER INTERVIEWED THE MATERIAL AFGHAN WITNESS (Abad), THE AFGHAN ATTEMPTED MURDER VICTIM (Karimullah), THE AFGHAN EYEWITNESS (Rahim), ANY WITNESS AGAINST THE ACCUSED, NOR MOVED TO COMPEL PRODUCTION OF ARMY BIOMETRICS CRIMINAL INFORMATION PROVING THE LOCAL NATIONALS WERE BOMBMAKERS?

(Doc. 13–6, Petition for Grant of Review; Doc. 13–7, at 5, Supplement to Petition for Grant of Review.)  The Petition for Grant of Review before the CAAF was denied.  *United States v. Lorance*, No. 17-0599/AR, CCA 20130679, 77 M.J. 136 (C.A.A.F. Dec. 19, 2017).

## II. Grounds for Relief in § 2241 Petition

Petitioner brings five grounds for relief in his Petition under § 2241:

1) Fifth Amendment Due Process:  Petitioner argues that he was deprived of his Fifth Amendment due process rights because the prosecution failed to disclose material exculpatory and mitigating evidence, including:

A. fingerprint and DNA evidence that Afghan men were not civilian casualties as the prosecution told the jury, but in fact terrorist bombmakers who intended to kill American Soldiers;

B. a Significant Activity Report completed one month after the shooting that concluded Petitioner's Platoon was being scouted for an impending attack or ambush and that at least one insurgent was killed – while the prosecution told the jury only civilian casualties occurred. The Army's undisclosed report gives credence to Petitioner's split-second judgment that the Platoon was in danger; and

C. the final investigative report issued by the U.S. Army Criminal Investigation Command ("CID") agents who investigated the case.

2) Prosecutorial Misconduct:

Petitioner argues that there was prosecutorial misconduct from pre-trial to post-trial, alleging the following specific grounds of prosecutorial misconduct:

> (a) initially accused at least nine First Platoon paratroopers of murder for the July 2, 2012, combat engagements when no credible evidence existed to do so;
> (b) segregated them from their Platoon Leader, Lorance, and compelled them to make written statements without the military equivalent of *Miranda* warnings or the availability of legal counsel;
> (c) issued "cleansing warnings," after which several paratroopers exercised their right to remain silent and seek the assistance of counsel;
> (d) later provided nine paratroopers with immunity from murder Charges;
> (e) ordered those nine paratroopers with immunity to cooperate in the prosecution of Lorance;
> (f) failed to disclose fingerprint and DNA evidence in the prosecution's possession, custody and control that proved Afghans were not civilians, but enemy combatants, implicating Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(d) ([prosecutor] shall make timely disclosure to the defense of all evidence or information known to the

[prosecutor] that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense all unprivileged mitigating information known to the [prosecutor]");

(g) failed to produce in response to a written defense request IED incident reports and criminal histories of violence of Afghans related to the case, to include Criminal Activity Analytical Reports (CAAR) and Be On the Lookout (BOLO) reports, implicating Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(d) ([prosecutor] shall make timely disclosure to the defense of all evidence or information known to the [prosecutor] that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense all unprivileged mitigating information known to the [prosecutor]");

(h) failed to disclose an Army Significant Activity Report or "SIGACT" which concluded that Lorance's patrol was being scouted for an impending attack or ambush, and that one enemy insurgent was killed, implicating Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(d) ([prosecutor] shall make timely disclosure to the defense of all evidence or information known to the [prosecutor] that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense all unprivileged mitigating information known to the [prosecutor]");

(i) lined out the names of the Afghans on the Charge Sheet, concealing their true legal status as unlawful enemy combatants;

(j) suggested that the previous Platoon Leader, medically evacuated from a bomb blast, line out only one phrase in his sworn statement, a phrase indicating that he too would not have allowed a motorcycle to get near his Platoon;

(k) objected to evidence that the Afghan National Army fired the rounds that hit the motorcycle riders;

(l) objected to evidence about the second engagement the morning of July 2, 2012, claiming it irrelevant to the circumstances surrounding Lorance's order in connection with the motorcycle when the undisclosed Significant Activity Report concluded the patrol was being scouted or [sic] an impending attack or ambush with at least one insurgent confirmed killed in action;

(m) objected to Lorance's biometric expert affiant on appeal while knowing his proffered testimony to be credible and failing to provide any evidence to the contrary;

(n) the Chief Judge of the Army Court publicly misstated the facts of the case and misinformed the public that Lorance changed the ROE when the jury acquitted him, and adopted an adversarial advocate's position as opposed to safeguarding the integrity of the

legal process; implicating Canons One, Two, and Three of the *Code of Judicial Conduct for Army Trial and Appellate Judges*, May 16, 2018 and the prohibitions against Army attorneys making extrajudicial comments that tend to heighten public condemnation of an accused, implicating Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(f) (Army attorneys will refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused);

(o) The Judge Advocate General of the Army misinformed at least one Member of the U.S. House of Representatives that Lorance changed the ROE to fire on motorcycles on sight when the jury acquitted him of that Charge, implicating the ethical prohibition against making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused per Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(f) (Army attorneys will refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused);

(p) declined to include citizens' petitions as part of the file presented to the Secretary of the Army for final action and threatened to shred them if Lorance did not arrange to have them removed from the Secretary of the Army's office;

(q) informed Lorance, notwithstanding his claims filed in court and presented to the Chief Judge of the Army Court personally that his "conviction and sentence, as well as the appellate review, were appropriately decided;"

(r) refused to process Lorance's Article II request for the President to "disapprove the findings and the sentence" claiming that there is no form for that request; and

(s) disregarded obligations to process the fingerprint and DNA evidence when Lorance's appellate defense team brought it to Army lawyers, to include the then Judge Advocate General of the Army, Lieutenant General Flora D. Darpino, against Army Regulation 27-26, *Rules of Professional Conduct for Lawyers*, June 28, 2018, ¶ 3.8(g)(1)(2) and (3) and ¶ 3.8(h) (*e.g.*, when an Army lawyer learns of new, credible, and material evidence or information creating a reasonable likelihood that a convicted accused did not commit an offense of which the accused was convicted at court-martial, the Army lawyer shall disclose that evidence to the accused, make reasonable efforts to cause an investigation, and seek to remedy the conviction).

(Doc. 1, at 67–70.)

3)  Sixth Amendment Ineffective Assistance of Defense Counsel:

Petitioner alleges that his retained civilian attorney:

A.  did not interview any American or Afghan witness, to include the Afghan attempted murder victim and two Afghan material eyewitnesses;

B.  arrived the night before this fully contested double murder and attempted murder jury trial where Petitioner faced a potential life sentence from another trial in a different state;

C.  did not reveal to the jury that witnesses were given immunity and ordered to cooperate in the case against Petitioner;

D.  did not interview the previous Platoon Leader who wrote that he would never allow a motorcycle to get near his Platoon; and

E.  failed to secure from the prosecution fingerprint and DNA evidence that the purported victims were not civilian casualties as the prosecution claimed, but terrorist bombmakers.

4)  Failure to Instruct on Affirmative Defenses:

Petitioner argues that the trial judge failed to instruct the jury on affirmative defenses that were raised and supported by the evidence presented at trial, such as justification, obedience to orders, mistake of fact, or duress.

5) Legally and Factually Insufficient Evidence:

Petitioner argues that the Army Court did not address the seemingly pivotal question Petitioner presented, a point that reasonably stood to require a new trial or a complete reversal: whether an order to fire based on ROE-compliance at targets that were insurgent bombmakers can be murder or attempted murder in a combat zone. Neither did the Army Court consider that even if the Afghan victims were truly innocent civilians, that they were casualties of war under applicable international law categorized as "collateral damage," decisions which occur regularly

when drone strikes kill innocent civilians. Nor did the Army Court evaluate the sufficiency of the remaining evidence after recognizing that Petitioner was acquitted of changing the ROE, an analysis the Army Court never embraced.

Petitioner seeks to reverse, overturn, and vacate his convictions and sentence in their entirety. (Doc. 1, at 78.)

## III. Standard of Review

A federal court may grant habeas corpus relief where a prisoner demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c). However, the Court's review of court-martial proceedings is very limited. *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th Cir. 2010). The Supreme Court has explained that "[m]ilitary law, like state law, is a jurisprudence which exists separate from the law which governs in our federal judicial establishment," and "Congress has taken great care both to define the rights of those subject to military law, and provide a complete system of review within the military system to secure those rights." *Nixon v. Ledwith*, 635 F. App'x 560, 563 (10th Cir. Jan. 6, 2016) (unpublished) (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953)). "[W]hen a military decision has dealt fully and fairly with an allegation raised in [a habeas] application, it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence." *Thomas*, 625 F.2d at 670 (quoting *Burns*, 346 U.S. at 142). Instead, it is the limited function of the civil courts "to determine whether the military have given fair consideration to each of the petitioner's claims." *Id*. (citing *Burns*, 346 U.S. at 145).

## IV. Exhaustion

"Like a state prisoner, a military prisoner must fully exhaust his claims in the military courts before raising a claim on federal habeas review." *Nixon*, 635 F. App'x at 565 (citations

omitted). "As with unexhausted state habeas claims, [the court] may review a claim that was not presented to the military courts if the military prisoner shows both 'cause excusing the procedural default and actual prejudice resulting from the error.'" *Id*. (citing *Lips v. Commandant*, 997 F.2d 808, 812 (10th Cir. 1993)). Therefore, a petitioner that has failed to exhaust a claim has waived the claim absent a showing of cause and actual prejudice, and "[t]he burden of showing prejudice is not an easy one." *Evans v. Horton*, ___ F. App'x ___, 2019 WL 5212906, at *2 (10th Cir. Oct. 11, 2019) (unpublished) (quoting *Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001)). "[I]t is not enough to assert than an error '*might have changed the outcome of trial*.'" *Id*.

Petitioner raises prosecutorial misconduct as a ground in his Petition, setting forth nineteen "improper methods" which he claims resulted, in whole or in part, in his conviction and sentence. (Doc. 1, at 67–70.) Prosecutorial misconduct occurs when trial counsel "'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (citation omitted). "Prosecutorial misconduct can be generally defined as an action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Id*. at 160 (citations omitted). Where a proper objection is made at trial, the military court reviews alleged prosecutorial misconduct for prejudicial error. *Id*. (citation omitted).

Although Petitioner asserts a separate claim for the alleged *Brady* violations, he did not present a claim for prosecutorial misconduct to the military courts. Because Petitioner's prosecutorial misconduct claim in unexhausted, his Petition contains a mix of exhausted and unexhausted claims. When faced with such a "mixed petition," a court may dismiss the entire

petition without prejudice to re-filing after the petitioner either exhausts all claims or resubmits the petition to proceed solely on the exhausted claims. *Gray v. Gray*, 645 F. App'x 624, 625–626 (10th Cir. 2016) (unpublished) (setting forth the court's options when facing a mixed petition and finding that the district court is not allowed to "effect a hybrid disposition of the petition, dismissing with prejudice all exhausted claims and dismissing without prejudice the unexhausted claims.") (citations omitted). "[T]he failure to exhaust available military remedies on *any* claim generally requires a civilian court to dismiss without prejudice the petition in its *entirety*; until the petitioner takes advantage of all modes of relief available in the military system, civilian review must await another day." *Banks v. United States*, 431 F. App'x 755, 757 (10th Cir. 2011) (unpublished) (citations omitted); *see also Piotrowski v. Commandant*, No. 08-3143-RDR, 2009 WL 5171780, at *12–13 (D. Kan. Dec. 22, 2009) (finding that the military courts are to hear post-conviction claims and setting forth options for post-conviction relief in the military courts).

The Court finds that dismissal without prejudice would allow Petitioner to attempt exhaustion in the military courts, and the military courts are in the best position to address the issue of procedural default. In *Piotrowski* the court stated that:

> Under *Burns* all available military remedies must be exhausted prior to, not after, § 2241 review. As a matter of comity and judicial efficiency, if nothing else, the military courts should continue to decide collateral challenges in the first instance and have the opportunity to correct their own errors, while applying their expertise in military law.
>
> The more difficult question of whether or not military appellate courts can retain or assert jurisdiction over a collateral action raising Mr. Piotrowski's unexhausted claims once his military discharge has been executed, is one to be answered in the first instance by the military courts. Likewise, whether or not Mr. Piotrowski can present sufficient grounds for a writ of error coram nobis is for those courts to decide in the first instance. These are

not issues that must or should be decided by this court before Mr. Piotrowski has made any attempt to present his unexhausted claims to the military appellate courts. If military tribunals refuse to hear his unexhausted claims because they have been procedurally defaulted, it is likely his new claims will be considered procedurally defaulted in federal civil court as well. Neither party has presented sufficient procedural or other facts or cited a clear, uniformly-applied military rule or case upon which this court might base a finding that petitioner's unexhausted claims have already been procedurally defaulted in the military courts. This court does not know, and expresses no opinion as to, what specific military remedies may remain available to Mr. Piotrowski under his current circumstances[ ]. Nevertheless, the court holds that its dismissal of petitioner's unexhausted claims is without prejudice to his attempting to exhaust any avenues of relief which may remain available to him, and his attempting to return to the district court once he has fully exhausted. *See Laster v. Samuels,* 325 Fed. Appx. 127, ——2 (3rd Cir. 2009).

*Piotrowski*, 2009 WL 5171780, at *13 (internal footnote omitted).

The court in *Gray v. Gray,* also considered the parties' arguments and found that the better course was to dismiss the petition in its entirety without prejudice to allow the petitioner to fully exhaust the unexhausted claims or to resubmit the petition without those claims. *Gray v. Gray*, No. 08-3289-JTM, Doc. 111 (D. Kan. Oct. 26, 2016). The court stated that:

Doing so furthers the strong preference "that military courts first be given every reasonable opportunity to address the merits of a military prisoner's post-conviction arguments," with the civilian courts reviewing those decisions rather than seeking to substitute their own judgment for that of the military courts. . . . "The policy expressed in [*Burns v. Wilson*, 346 U.S. 137 (1953)] contemplates the orderly presentation of *all* issues to the military courts, and only afterwards [are they] presented by habeas corpus to civilian courts." . . . Respondent urges the court to deny the unexhausted coram nobis claims as clearly meritless or procedurally barred. But the policies noted above counsel toward allowing the military courts the first opportunity to address these questions. While the additional delay occasioned by a dismissal without prejudice is regrettable, the military courts have traditionally moved expeditiously to address such claims. Moreover, in the face of what are obviously complex procedural rules governing habeas claims, adherence to the preferred order of presentation outlined in

> *Burns* will avoid injecting unnecessary procedural error that would
> only further delay final disposition of the case.

*Id*. at Doc. 111, p. 2.

The Court agrees that the better course is to dismiss the mixed petition without prejudice to allow Petitioner to attempt to fully exhaust any unexhausted claims in the military courts, or to submit a petition without those claims. In light of the Court's ruling, Petitioner's motion to expand the record and motion for discovery are denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the Petition is **dismissed without prejudice.**

**IT IS FURTHER ORDERED** that Petitioner's Motion to Expand the Record (Doc. 19) and Petitioner's Motion for Discovery (Doc. 23) are **denied.**

**IT IS SO ORDERED**.

**Dated November 8, 2019, in Kansas City, Kansas.**


**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**